UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 14-02456-JGB (KKx)** | Date | July 23, 2015 |
|---|---|---|---|
| Title | ***Blyden v. Navient Corp., et al.*** | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff: | Attorney(s) Present for Defendants: |
|---|---|
| None Present | None Present |

**Proceedings:    Order GRANTING Defendants' Motions to Dismiss (Doc. Nos. 21, 22, 26) (IN CHAMBERS)**

Before the Court are Defendants' motions to dismiss Plaintiff's Second Amended Complaint. (Doc. Nos. 21, 22, 26.) After considering the materials submitted by the parties, the Court GRANTS the motion. Plaintiff may amend, subject to the admonishments contained in this order.

### I. BACKGROUND

Plaintiff Marlene Blyden ("Plaintiff") brought this putative class action against Defendants Navient Corporation ("Navient Corp"), Navient LLC, Navient Credit Finance Corporation ("NCFC"), Navient Investment Corporation ("NIC"), Navient Solutions, Inc. ("NSI"),[1] Bank of New York Mellon ("Trustee"),[2] Bank of New York Mellon Trust Company, N.A. ("Indenture Trustee"),[3] SLM Private Credit Student Loan Trust 2003-A, SLM Private Credit Student Loan Trust 2003-B, SLM Private Credit Student Loan Trust

---

[1] The Court will refer to Navient Corp (including its now-merged subisidiary, Navient LLC), NCFC, NIC, and NSI collectively as the "Navient Defendants."

[2] Bank of New York Mellon was erroneously named as Bank of New York in the Complaint. (Doc. No. 28 at 1.)

[3] The Court will refer to Trustee and Indenture Trustee collectively as the "Trustee Defendants."

---

2003-C, SLM Private Credit Student Loan Trust 2004-A, SLM Private Credit Student Loan Trust 2004-B, SLM Private Credit Student Loan Trust 2005-A, SLM Private Credit Student Loan Trust 2005-B, SLM Private Credit Student Loan Trust 2006-A, SLM Private Credit Student Loan Trust 2006-B, and SLM Private Credit Student Loan Trust 2006-C.[4]

Plaintiff filed her Second Amended Complaint ("SAC") on February 4, 2015. (Doc. No. 18.) On March 6, 2015, Defendants' brought three separate motions to dismiss the SAC. (Doc. Nos. 21, 22, 26.)

## II.    ALLEGATIONS OF THE SAC

Plaintiff entered into a loan contract, which specified the nominal lender as First National Bank of Sioux Falls ("Sioux Falls National Bank" or "SFNB"). (Doc. No. 18-1 Exs. C, D (respectively, "Loan Application" and "Disclosure Statement").) The loan was subsequently assigned to a now-defunct entity, the Student Loan Marketing Association ("SLMA"). (SAC ¶ 175.) SLMA, through a series of mergers, eventually became Defendant Navient LLC (now Navient Corp).[5] (SAC ¶¶ 45(a), (b).) Defendant NSI serviced Plaintiff's loan from its inception. (SAC ¶ 176.) Plaintiff's loan was either kept by Navient Corp or securitized and sold to one of the Trust Defendants.[6] (SAC ¶ 128.)

From July 1, 2006 to September 30, 2007, Plaintiff was charged interest on her loan at a rate of 10.25%. (SAC ¶¶ 173, 180, 185, 186.) This is considered usury under California law, which prohibits charging interest at a rate above 10%. (SAC ¶ 11, 12.) Sioux Falls National Bank, the nominal lender, is exempt from California usury law under the National Bank Act, which allows national banks to charge interest under their home states' usury laws and preempts application of other states' usury laws. (SAC ¶ 6.) However, none of the Defendants in this case are national banks, so they are not exempt from California usury laws because the National Bank Act does not apply to them. (See SAC ¶ 9.)

Plaintiff believed the 10.25% interest to be lawful because her loan was made by a national bank, even though it was subsequently assigned to another entity not covered by the National Bank Act. (SAC ¶ 192.)

---

[4] The Court will refer to the SLM Private Credit Student Loan Trust defendants collectively as the "Trust Defendants" and individually by the abbreviations "2003-A Trust," "2003-B Trust," etc.

[5] According to the SAC, during the relevant time periods, most of the Navient Defendants operated under another name or subsequently merged with the entities actually described in the SAC. Hereafter, to avoid confusion, the Court refers to the entities by their current names, assuming the SAC's allegations of mergers to be true.

[6] While it appears from the SAC that Plaintiff does not know who owns her loan, the Trust Defendants disclose in their motion that the 2003-B Trust is the owner. (See Doc. No. 28 at 7-8 ("SLM Private Credit Student Loan Trust 2003-B . . . is in fact the statutory trust that owns Plaintiff's student loan").)

**CIVIL MINUTES**
**GENERAL**       Initials of Deputy Clerk MG/wr

On November 28, 2013, a document was made public, which Plaintiff contends revealed the unlawful nature of the interest. (SAC ¶ 193.) The document was a Loan Purchase Agreement ("LPA") between Navient Corp and Sioux Falls National Bank, under which Navient Corp provided the funding for the loans made by SFNB and then purchased the loans "at cost" shortly after the loan was disbursed. (SAC ¶¶ 83, 84, 100, 109; Doc. No. 18-1 Ex. A.)

According to Plaintiff, the LPA reveals that Navient Corp was the de facto lender of Plaintiff's loan, making the National Bank Act inapplicable. (SAC ¶ 192-95.) Accordingly, without the National Bank Act's preemption of California's usury laws, Plaintiff cannot be charged more than 10% interest on her loans. Plaintiff wishes to represent a class of borrowers whose loans were made under this LPA and are now held by Navient Corp, NCFC, or one of the Trust Defendants.

Defendants brought three motions to dismiss, each asserting multiple grounds for dismissal, including lack of Article III jurisdiction and failure to state a claim.

## III.    THE PARTIES' FILINGS

The Court is disappointed, to varying degrees, with all parties in this case. What should have been a straightforward set of legal disputes consumed an undue amount of the Court's time, due to (A) Defendants' unnecessarily convoluted presentation of their grounds for dismissal; and (B) Plaintiff's questionable representations of case holdings, which made it necessary to carefully review, in detail, every case cited by Plaintiff in order to meaningfully evaluate Plaintiff's arguments. The Court has done its best to address the central disputes between the parties, but several issues will need to await resolution until consideration of Plaintiff's next amended complaint. If those unresolved issues are raised again, the Court trusts that the parties will heed the admonishments below and make a sincere attempt to avoid presenting their disputes in such an unwieldy fashion.

### A.    Defendants' Motions

Before turning to the significantly more serious issue of Plaintiff's opposition briefs, a few prefatory remarks are due the Defendants.[7]

On March 6, 2015, the Court received a motion to dismiss the SAC filed on behalf of NSI ("NSI's MTD"). (Doc. No. 21.) The same day, the Court received a motion to dismiss the SAC filed on behalf of Defendants NCFC, Navient LLC, Navient Corp, and NIC ("Navient Affiliates' MTD"). (Doc. No. 22.) The same day, the Court received a motion to dismiss the SAC filed on behalf of the Trustee Defendants, the Trust Defendants, and non-party SLM Private Credit Student Loan Trust 2002-A ("non-party 2002-A") ("Trusts/Trustees' MTD"). (Doc. Nos. 26, 28.)

---

[7] Nothing herein should be interpreted to suggest that Defendants have done anything improper. The Court's admonitions are directed to "best practices" rather than "minimal standards."

**CIVIL MINUTES**
**GENERAL**          Initials of Deputy Clerk MG/wr

Defendants' three partially overlapping, cross-referencing motions make it very difficult for the Court to resolve the disputes between the parties with any judicial efficiency. Beyond the confusion created by the three sets of similar-though-not-identical arguments, within the individual briefs arguments are arranged haphazardly and grouped in ways that conflate underlying legal issues.[8] Even after the arguments are disentangled and clarified, it is difficult to determine which arguments relate to which claims against which defendants.

NSI's MTD argues that

1. Plaintiff's claims are time-barred (NSI's MTD at 11);

2. Plaintiff lacks Article III standing to seek injunctive relief because there is no imminent danger of her interest rising above 10% (id. at 20); and

3. Plaintiff fails to state a claim for

   a. usury, because NSI only serviced Plaintiff's loan and therefore never kept the interest from Plaintiff's loan (id. at 21-22);

   b. unfair competition, because only restitution is available for this claim, and NSI doesn't possess the allegedly usurious interest payments (id. at 23);

   c. conversion, because

      i. NSI never exercised dominion over Plaintiff's money (id. at 23);

      ii. a generalized claim for money damages is not actionable as conversion (id. at 24).

Navient Affiliates' MTD argues that

1. the Court lacks personal jurisdiction over the Navient Affiliates (Navient Affiliates' MTD at 6);

2. Plaintiff lacks Article III standing because none of her alleged injuries result from any action by NCFC (only asserted by NCFC) (id. at 11);

3. Plaintiff fails to state a claim for

   a. conversion, because NCFC never exercised dominion over Plaintiff's property (only asserted by NCFC) (id. at 12);

---

[8] See, e.g., Navient Affiliates' MTD at 12 (in a section addressing Article III's Case or Controversy requirement, arguing that "an essential element of conversion" is missing); NSI's MTD at 19 (arguing that Plaintiff lacks Article III standing because she was not injured "within the statute of limitations period"); Trusts/Trustees' MTD at 7 (arguing that Article III's standing requirement isn't met because "a usury claim brought under California law must be brought against the loan owner").

**CIVIL MINUTES**
                                    **GENERAL**                      Initials of Deputy Clerk MG/wr

      b.   money had and received, because NIC possesses only a beneficial interest in the trust holding Plaintiff's loan and is therefore not a true owner of the trust's assets (only asserted by NIC) (<u>id.</u> at 13-14);

      c.   usury, because there is no "joint enterprise" liability for usury (<u>id.</u> at 15); and

   4.  Plaintiff fails to state any claim, because

      a.   a parent company is not generally liable for the actions of its subsidiaries (only asserted by Navient LLC and Navient Corp) (<u>id.</u> at 12-13);

      b.   Plaintiff has failed to plead conspiracy with adequate specificity (<u>id.</u> at 16).

In addition to asserting the arguments above, the Navient Affiliates' MTD also incorporates—pages 11-19 of NSI's MTD, which assert that Plaintiff's claims are time-barred. (<u>See</u> Navient Affiliates' MTD at 16.)

The Trust and Trustee Defendants' MTD argues that

   1.  Plaintiff's claims are time-barred (Trusts/Trustees' MTD at 5);

   2.  Plaintiff lacks Article III standing because

      a.   Plaintiff does not allege that any of the Trust Defendants owns her loan (only asserted by non-party 2002-A and all Trust Defendants except the 2003-B Trust) (<u>id.</u> at 6-8);

      b.   Trustee Defendants have never received interest on Plaintiff's loan in their individual capacities (only asserted by Trustee Defendants) (<u>id.</u> at 9-10);

   3.  Plaintiff fails to state a claim for conversion, because

      a.   Plaintiff's conversion claim is time-barred (<u>id.</u> at 10);

      b.   a generalized claim for money damages is not actionable as conversion (<u>id.</u> at 10);

      c.   conversion requires exercising dominion over Plaintiff's property (only asserted by non-party 2002-A, Trustee Defendants, and all Trust Defendants except the 2003-B Trust) (<u>id.</u> at 10-11); and

   4.  Plaintiff's complaint fails to comply with Federal Rule of Civil Procedure 8 because

      a.   it does not give Trustee Defendants fair notice of their allegedly wrongful conduct (only asserted by Trustee Defendants) (<u>id.</u> at 11);

      b.   it fails to name Trustee Defendants in their proper capacity as trustees (only asserted by Trustee Defendants) (<u>id.</u> at 12).

In addition to making the arguments above on their own behalf, the Trust Defendants, the Trustee Defendants, and non-party 2002-A also submitted a "motion" to

join NSI's MTD, incorporating by reference "each and every of [NSI's] filings in Support of the Motion as though set forth in full." (Doc. No. 29.)

Having already spent a significant amount of time cross-referencing the various motions simply to determine what arguments are being advanced by whom, the Court is left with an even more daunting task: determining the most efficient way to approach this veritable web of asserted grounds for dismissal.

The Court is aware that each Defendant may have felt compelled to assert every defense available for fear of waiving arguments. The Court is also aware that Defendants may have wished to place emphasis on different arguments, making it difficult to jointly brief all of the relevant issues. However, given the amount of overlap in Defendants' arguments and—even more significantly—given Defendants' attempts to join each other's motions or incorporate entire sections of each other's briefs by reference, it is difficult to believe that Defendants' interests were in such conflict they could not coordinate better so as to (A) raise (and argue) each discrete legal issue only once, and (B) present Defendants' grounds for dismissal in an order (or in groupings) amenable to efficient judicial resolution.

As an example, challenges to jurisdiction were raised in every brief, by almost every party, and were substantively quite similar, and the Court is obligated to assure itself of its jurisdiction before even considering the parties' arguments on the merits. Accordingly, considerations of efficiency would have favored addressing the jurisdictional challenges in full before either the parties or the Court spent significant time addressing any issues on the merits. Upon request, the Court could have ordered that the jurisdictional challenges be briefed and decided before any briefing on the merits. This would have

    a) allowed multiple parties with similar jurisdictional challenges to submit a single brief, even though their merits arguments (made only in the alternative) might have been too diverse to allow consolidated briefing; and

    b) ensured that, if and when the Court ultimately proceeded to arguments on the merits, it would only be confronted with disputes it has the authority to resolve.

Certainly, such exceptions to the Court's normal procedures are not common and the Court does not wish to encourage parties to routinely request special briefing accommodations. But given the state of the briefs now before the Court, it appears that a departure from usual practices would have been the lesser of two evils.

**B.   Plaintiff's Oppositions**

Although Defendants' presentation of arguments leaves much to be desired, it was not the only cause of the undue expenditure of time and resources necessary to address the parties' disputes.

As discussed more fully below, several of the Defendants whose motions consumed significant time have no place in this action and very clearly should not have been named as defendants. The section of Plaintiff's brief addressing these Defendants is replete with mischaracterizations and misstatements of the relevant case law.

**CIVIL MINUTES
GENERAL**      Initials of Deputy Clerk MG/wr

It appears in many respects as though counsel, instead of attempting to determine the proper defendants, simply named as many parties as possible and left it to motions practice to select the proper subset. The Court trusts this is not the case, but the extent to which counsel exercised meaningful discretion in determining the proper defendants is not readily apparent.

This implicates ethical as well as practical concerns. In light of these concerns, the Court finds it prudent to remind counsel for all parties of their ethical and legal obligations when making representations to this Court.[9]

> **Representations to the Court.** By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

Fed. R. Civ. P. 11(b), (b)(2).

"Rule 11 sets a low bar." Strom v. United States, 641 F.3d 1051, 1059 (9th Cir. 2011). It does not prohibit "reasonable, albeit unpersuasive, interpretations of the law." Premier Commercial Corp. v. FMC Corp., 139 F.R.D. 670, 672 (N.D. Cal. 1991). Rather, "[a]n argument contained in a motion is frivolous under Rule 11 if it is unreasonable when viewed from the perspective of a competent attorney admitted to practice before the district court." United States v. Stringfellow, 911 F.2d 225, 226 (9th Cir. 1990).

When a complaint is submitted to the Court, the filing represents "counsel's certification that the facts [alleged in the complaint] gave rise to a legal right in the plaintiff[] under existing law or a good faith argument for the extension, modification, or reversal of existing law." Zaldivar v. City of Los Angeles, 780 F.2d 823, 831 (9th Cir. 1986) (internal quotations omitted).

> A good faith belief in the merit of a legal argument is an objective condition which a competent attorney attains only after "reasonable inquiry." Such inquiry is that amount of examination into the facts and legal research which is reasonable under the circumstances of the case. Of course, the conclusion drawn from the research undertaken must

---

[9] This discussion is not intended to suggest that any of the parties' filings thus far actually rises to the level of a violation of these obligations. But the possibility that counsel, in the heat of zealous advocacy, may have paid them inadequate attention merits reiterating their importance.

**CIVIL MINUTES**
**GENERAL**   Initials of Deputy Clerk MG/wr

> itself be defensible. Extended research alone will not save a
> claim that is without legal or factual merit . . . .

Id.

Thus, while the requirement that attorneys' positions be supported by nonfrivolous arguments is not a stringent one, neither is it an empty formality. "Frivolous arguments and misstatements of law waste not only the parties' time and resources, but they also waste the Court's time and resources." Premier Commercial Corp., 139 F.R.D. at 674.

## IV.    LEGAL STANDARD

### A.    Article III Standing

The Court has an independent obligation to assure itself of litigants' standing under Article III. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 340 (2006). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94 (1998).

Furthermore, "standing is not dispensed in gross." DaimlerChrysler, 547 U.S. at 353 (citing Lewis v. Casey, 518 U.S. 343, 357 (1996)). A plaintiff "must demonstrate standing for each claim he seeks to press . . . [and] must demonstrate standing separately for each form of relief sought." Id. at 352.

The "irreducible constitutional minimum of standing contains three elements," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992):

1.  The plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.

2.  There must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.

3.  It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. at 560-61.

### B.    Rule 12(b)(1)

"Because standing and mootness both pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6)." White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes

the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004) (internal citations omitted). Defendants here present a facial challenge to the Court's jurisdiction.

### C.   Rule 12(b)(6)

"The focus of any rule 12(b)(6) dismissal . . . is the complaint." <u>United States v. Corinthian Colleges</u>, 655 F.3d 984, 991 (9th Cir. 2011).

Under the pleading requirements of Federal Rule of Civil Procedure 8(a)(2), the Court must determine whether the Complaint contains "sufficient factual matter" that, taken as true, "state[s] a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Pursuant to this analysis, only factual allegations, as opposed to legal conclusions, are entitled to an assumption of truth. <u>Id.</u> at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> If the Complaint does contain such supporting factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. <u>Id.</u> at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u>

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be plead generally, or in accordance with Rule 8." <u>Corinthian Colleges</u>, 655 F.3d at 992.

Finally, because Courts do not assume the correctness of a complaint's legal conclusions, a complaint—though replete with facts—should be dismissed if its claims for relief are premised on an invalid legal theory. <u>Iqbal</u>, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"); <u>Conservation Force v. Salazar</u>, 646 F.3d 1240, 1242 (9th Cir. 2011) ("[D]ismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.").

## V.   DISCUSSION

### A.   Trust Defendants

The Court addresses standing first, as it has an independent obligation to assure itself of its own jurisdiction under Article III. <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 340 (2006). To satisfy the requirements of Article III, a plaintiff "must demonstrate standing for each claim he seeks to press . . . [and] must demonstrate standing separately for each form of relief sought." <u>Id.</u> at 352.

The Trust Defendants argue that, because the 2003-B Trust is the only trust that ever owned or received interest on Plaintiff's loan, Plaintiff has failed to allege any concrete

injury traceable to the other trusts, which never owned her loan. Thus, they argue, Plaintiff's claims against all other Trust Defendants[10] must be dismissed. Plaintiff resists this conclusion by pressing several arguments. As discussed below, none has merit.

### 1.   Standing Based on an Uncertified Class

Plaintiff appears to recognize she has no individual standing to sue trusts that never owned her loan, but urges that her intention to represent a class of other potential plaintiffs changes the analysis. According to Plaintiff, "[t]he Trusts seek to dismiss the claims of putative class members whose virtually identical notes are held by virtually identical other named trusts." (Doc. No. 35 ("Trusts/Trustees Opp'n") at 8.)

This argument is inapposite, as the claims of putative class members are not before this Court. Until a class is certified, Plaintiff proceeds in an individual capacity and asserts claims on behalf of herself only. See Smith v. Bayer Corp., 131 S. Ct. 2368, 2380 (2011) ("[A]ccording to Bayer, . . . he 'acted in a representative capacity when he sought class certification.' ¶ But wishing does not make it so. . . . Federal Rule 23 determines what is and is not a class action in federal court . . . ."); Standard Fire Ins. Co. v. Knowles, 133 S. Ct. 1345, 1349 (2013) ("[A] plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified.").

Of course, at the class certification stage, the Court would be obliged to verify its jurisdiction over the claims of putative class members, so that judgment on Plaintiff's claims could constitutionally bind class members as well as Plaintiff. See, e.g., In re Carrier IQ, Inc., No. C-12-MD-2330 EMC, 2015 WL 274054 (N.D. Cal. Jan. 21, 2015) (finding named plaintiffs' claims justiciable, but deferring determination of justiciability of unnamed class members' claims until class certification).

At this point in the proceedings, the only claims against the Class-Only Trusts are Plaintiff's individual claims, which must be justiciable to survive a motion to dismiss. This approach is consistent with the practice of nearly all district courts to face the issue. See, e.g., In re Actimmune Mktg. Litig., 614 F. Supp. 2d 1037, 1053-54 (N.D. Cal. 2009) aff'd, 464 F. App'x 651 (9th Cir. 2011) (focusing its "instant inquiry on the standing concerns that presently exist for the individual plaintiffs"); In re Frito-Lay N. Am., Inc. All Natural Litig., No. 12-MD-2413 RRM RLM, 2013 WL 4647512, at *11 (E.D.N.Y. Aug. 29, 2013) ("[O]nce there is at least one named plaintiff for every named defendant who can assert a claim directly against that defendant, Article III standing is satisfied and only then will the inquiry shift to a class action analysis."); Donohue v. Apple, Inc., 871 F. Supp. 2d 913, 921-22 (N.D. Cal. 2012) (looking to Plaintiff's Article III standing with respect to individual claims, but concluding that Plaintiff's ability to assert class members' claims "boil[s] down to questions of whether common issues predominate and whether plaintiff can adequately represent absent class members, issues that are better resolved at the class certification stage"); In re Carrier IQ, Inc., No. C-12-MD-2330 EMC, 2015 WL 274054, at *9 (N.D. Cal. Jan. 21, 2015) ("[O]nce threshold standing is established, the Court has the power to certify the class before addressing the standing of

---

[10] The Court will refer to all Trust Defendants other than the 2003-B Trust collectively as the "Class-Only Trusts."

**CIVIL MINUTES**            Initials of Deputy Clerk MG/wr
                                          **GENERAL**

unnamed class members.") ; <u>Jepson v. Ticor Title Ins. Co.</u>, No. C06-1723 JCC, 2007 WL 2060856, at *2 (W.D. Wash. May 1, 2007) ("[T]he Named Plaintiff in this action alleges an injury from this very Defendant and merely purports to represent a class of those similarly injured by this Defendant under analogous laws in other states. Addressing class certification prior to standing in such circumstances is clearly warranted."); <u>Garrison v. Whole Foods Mkt. Grp., Inc.</u>, No. 13-CV-05222-VC, 2014 WL 2451290, at *4 (N.D. Cal. June 2, 2014) (addressing Plaintiff's standing to pursue individual claims before looking to commonality with respect to class claims); <u>Kassman v. KPMG LLP</u>, 925 F. Supp. 2d 453, 468-69 (S.D.N.Y. 2013) ("[T]o the extent that Defendant moves to dismiss or strike the named Plaintiffs' claims . . . on the ground that they lack standing, that motion is denied on the merits. To the extent that Defendant . . . attack[s] the standing of potential class members . . . its motion is denied as premature, because such arguments go to the propriety of certifying a class under Rule 23 . . . ."); <u>In re Bear Stearns Mortgage Pass-Through Certificates Litig.</u>, 851 F. Supp. 2d 746, 778 (S.D.N.Y. 2012) ("Once, as here, a named plaintiff has established that she suffered the same species of injury as the members of the class, traceable to the same unlawful conduct by a defendant, she has fulfilled the requirements of constitutional standing. Having satisfied Article III's standing criteria, the dissimilarities between the [claims] is an issue appropriately left to the class certification stage.") (citing 7AA Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1785.1 (2d ed. 2005) ("Representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.")); <u>see also</u> <u>Fallick v. Nationwide Mut. Ins. Co.</u>, 162 F.3d 410, 423 (6th Cir. 1998) ("Threshold individual standing is a prerequisite for all actions, including class actions. A potential class representative must demonstrate individual standing vis-as-vis [sic] the defendant; he cannot acquire such standing merely by virtue of bringing a class action. . . . Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure.") (internal citations omitted); <u>cf.</u> <u>Gratz v. Bollinger</u>, 539 U.S. 244, 262-63 (2003) (noting that, as long as plaintiff has standing to seek injunctive relief against the defendant, the proper scope of the injunction against the defendant is potentially a Rule 23 "adequacy" problem rather than a standing problem). But unlike the justiciability of Plaintiff's individual claims, the justiciability of unnamed class members' claims is not relevant unless and until those claims are before the Court.

Accordingly, because Plaintiff cannot trace any personal injury to the Class-Only Trusts, she lacks standing to sue them.

### 2.   Deferral of Standing Determination

Apparently recognizing that she cannot rely on class members for standing before class certification, Plaintiff argues in the alternative that the Court should wait and address standing at the class certification stage. In support of this argument, Plaintiff cites <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591 (1997), and <u>Ortiz v. Fibreboard Corp.</u>, 527 U.S. 815 (1999). In both cases, the Supreme Court was asked to determine whether

proposed settlement classes were proper for certification. Although Article III challenges were raised in both cases, the Supreme Court addressed the Rule 23 requirements first, finding them dispositive:

> The nub of this case is the certification of the class under Rule 23[] . . . but before we reach that issue, there are . . . threshold matters. First, petitioners call the class claims nonjusticiable under Article III, saying that . . . the "vast majority" of the "exposure-only" class members [are] without injury in fact and hence without standing to sue. Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. But the class certification issues are, as they were in <u>Amchem</u>, "logically antecedent" to Article III concerns and themselves pertain to statutory standing, which may properly be treated before Article III standing. Thus the issue about Rule 23 certification should be treated first, mindful that the Rule's requirements must be interpreted in keeping with Article III constraints.

<u>Fibreboard</u>, 527 U.S. at 830-31 (internal citations omitted).

Plaintiff argues "[t]his is one of those cases where adjudication of class certification should precede any evaluation of standing because the class certification issue is logically antecedent to Article III standing." (Trusts/Trustees Opp'n at 15 (internal quotations omitted).) According to Plaintiff, certification issues are "logically antecedent" here because "the standing concerns would not exist but for the class-action certification." (<u>Id.</u> (internal quotations omitted).) The reason class certification issues are logically antecedent "is that if the putative class is certified in this case, Movants' standing arguments are necessarily defeated." (<u>Id.</u>)

This argument fails to recognize the critical feature of <u>Amchem</u> and <u>Fibreboard</u>, which involved settlement-only classes:

> [Defendant] CCR, together with the plaintiffs' lawyers CCR had approached, launched this case . . . .
>
> The class action thus instituted was not intended to be litigated. Rather, within the space of a single day . . . the settling parties—CCR defendants and the representatives of the plaintiff class described below—presented to the District Court a complaint, an answer, a proposed settlement agreement, and a joint motion for conditional class certification.
>
> . . .
>
> A stipulation of settlement accompanied the pleadings; it proposed to settle, and to preclude nearly all class members from litigating against CCR companies . . . .

<u>Amchem</u>, 521 U.S. at 601-03 (internal section headings omitted).

**CIVIL MINUTES
GENERAL**

Initials of Deputy Clerk MG/wr

Because the named parties had already reached an agreement to settle, they had no need of a federal court to effect a binding settlement of their individual claims. That could be accomplished with a standard contractual waiver, irrespective of the justiciability of those potential claims.

Therefore, when the parties filed suit in federal court, they were not invoking the judicial power to effectuate a settlement between themselves—the judicial power is unnecessary for that—they were asking the court to effectuate a settlement binding across an entire class of potential litigants. While the parties could settle their individual claims without the Court's involvement, the power of the Court was necessary to make the settlement binding on class members, and the Court could only exercise that power on claims over which it had jurisdiction. This made the class certification issues "logically antecedent to the existence of any Article III issues" because, unless the class was certified, any exercise of the federal judicial power would be wholly unnecessary.

Amchem and Fibreboard are clearly inapplicable to the issue before the Court, because Plaintiff is invoking the power of this Court irrespective of whether a class is certified. The issue of standing must be addressed now. See Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); see also Easter v. American West Financial, 381 F.3d 948 (2004) (distinguishing Fibreboard and holding that "[t]he district court correctly addressed the issue of standing before it addressed the issue of class certification").

### 3. Standing Based on a Certified Class

Even if the Court were to defer its standing determination, class certification would not save Plaintiff's claims against the Class-Only Trusts. A lack of Article III jurisdiction cannot be cured through class certification, as the Federal Rules of Civil Procedure "do not extend or limit the jurisdiction of the district courts." Fed. R. Civ. P. 82.

It should be beyond dispute that Rule 23 cannot operate to confer jurisdiction where it would not otherwise exist. See, e.g., Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 40 (1976) ("That a suit may be a class action, however, adds nothing to the question of standing."); O'Shea v. Littleton, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."); Warth v. Seldin, 422 U.S. 490, 502 (1975) ("Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."); cf. Lewis v. Casey, 518 U.S. 343, 358 (1996) ("The standing determination is quite separate from certification of the class.").

Seeking to escape this conclusion, Plaintiff argues:

> In La Mar v. H & B Novelty & Loan Co., 489 F.2d 461, 464-65 (9th Cir. 1973) the Ninth Circuit held that a plaintiff has standing to sue an "unrelated" group of defendants who engaged in conduct closely similar to that of the single defendant, on behalf of all those injured by the defendants where the class plaintiffs as a group—named and

**CIVIL MINUTES**
**GENERAL**

> unnamed—have suffered "injuries [that] are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury," [or where] "all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." <u>Id.</u> 489 F.2d at 466. Both of these exceptions apply here.

(Trusts/Trustees Opp'n at 10.)

It is difficult to believe this characterization of <u>La Mar</u>'s holding was made in good faith. As an initial matter, the Court in <u>La Mar</u> did not reach the issue of standing, but disposed of the case instead on Rule 23 grounds:

> [F]or the purposes of these appeals, we are prepared to assume the presence of standing.
>
> Our assumption is not intended to foreclose the issue. . . . No one contends, of course, that there is no case or controversy between the defendants who seek . . . to be dismissed and their customers [unnamed class members]. The issue upon which we turn these cases is whether the plaintiff . . . can represent such customers under Rule 23.

<u>La Mar</u>, 489 F.2d at 464.

The <u>La Mar</u> Court expressly declined to address standing, but instead assumed standing for the purpose of determining whether Rule 23 authorized the plaintiffs to represent their proposed class. Plaintiff's characterization, implying the Ninth Circuit actually considered and decided the standing question, is questionable in this regard.

But Plaintiff's conflation of Rule 23 requirements with Article III standing is not even the most problematic aspect of Plaintiff's characterization. More troubling is Plaintiff's suggestion that the <u>La Mar</u> holding supports—in any fashion—Plaintiff's claims against the Class-Only Trusts. The actual holding of <u>La Mar</u> is set forth very succinctly in the first paragraph of the opinion:

> The common issue of these cases is whether a plaintiff having a cause of action against a single defendant can institute a class action against the single defendant and an unrelated group of defendants who have engaged in conduct closely similar to that of the single defendant on behalf of all those injured by all the defendants sought to be included in the defendant class. <u>We hold that he cannot.</u> Under proper circumstances, the plaintiff may represent all those suffering an injury similar to his own inflicted by the defendant responsible for the plaintiff's injury, but in our view he cannot represent those having causes of action against other defendants against whom the plaintiff has no cause of action and from whose hands he suffered no injury.

<u>Id.</u> at 462 (emphasis added).

Plaintiff's characterization of this holding—"that a plaintiff has standing to sue an 'unrelated' group of defendants"—is wholly inaccurate.[11] With respect to Plaintiff's standing argument, the best that can reasonably be said about <u>La Mar</u> is that it has no direct bearing on the issue.

If this were the full extent of Ninth Circuit case law on the matter, it might be possible to conclude that Plaintiff's standing argument is reasonable, albeit extremely unpersuasive. But following <u>La Mar</u>, after the Supreme Court subsequently rejected the practice of "assuming" jurisdiction,[12] the same issue came before the Ninth Circuit again, and this time the Court was squarely faced with the standing question. <u>See</u> <u>Easter v. Am. W. Fin.</u>, 381 F.3d 948 (9th Cir. 2004).

<u>Easter</u> presented claims incredibly similar to the claims in this case. In <u>Easter</u>, the named Plaintiffs had taken out (allegedly usurious) loans and the lenders "later sold the loans to various investment trusts . . . which pooled the loans together, securitized the loans into trusts, and sold interests in the trusts to investors." <u>Id.</u> at 954. Whether the loans violated the state's usury laws depended on whether the nominal lenders were also the <u>de facto</u> lenders. The plaintiffs asserted claims against multiple trusts on behalf of themselves and other similarly situated borrowers. <u>Id.</u> at 955. "The Trust Defendants filed a joint motion to dismiss . . . contending that Borrowers lacked standing to sue any trust defendant who had not held a named plaintiff's loan," and the district court granted the motion. <u>Id. at 956.</u>

On appeal, the Ninth Circuit first noted that the "district court correctly addressed the issue of standing before it addressed the issue of class certification." <u>Id.</u> at 962. The Court then affirmed the district court's dismissal for lack of standing:

> With respect to those Trust Defendant [sic] that do not hold a named plaintiff's note, we affirm the district court's ruling that plaintiffs have failed to link their causes of action with specific actions of the 39 Trust defendants and therefore lack standing to sue. Constitutional standing requires a plaintiff to demonstrate: (1) an injury in fact; (2) traceability, i.e., a causal connection between the injury and the actions complained of; and (3) redressability.
>
> To satisfy the traceability requirement, a class action plaintiff must allege a distinct and palpable injury to himself,

---

[11] The rest of the language quoted by Plaintiff actually appears in a short section of dictum, in which the <u>La Mar</u> Court acknowledged a very narrow potential exception to its analysis under the typicality and adequacy requirements. <u>Id.</u> at 466.

[12] <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94 (1998) ("The Ninth Circuit has denominated this practice—which it characterizes as 'assuming' jurisdiction for the purpose of deciding the merits—the 'doctrine of hypothetical jurisdiction.' ¶ We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers.") (internal citations omitted).

**CIVIL MINUTES GENERAL**

> even if it is an injury shared by a large class of other possible litigants. Here, no named plaintiff can trace the alleged injury in fact—payment of usurious interest rates—to all of the Trust Defendants, but only to the Trust Defendant that holds or held that plaintiff's note. As to those trusts which have never held a named plaintiff's loan, Borrowers cannot allege a traceable injury and lack standing.

Id. at 961-62 (internal citations omitted).

Thus, on facts essentially indistinguishable from the present case, the Ninth Circuit held that plaintiffs lacked standing to sue trusts that never held their loans, irrespective of their status as potential class representatives.

When filing the opposition to Trust Defendants' motion to dismiss, Plaintiff's counsel was certainly aware of the Easter decision, as it is cited in the opposition itself. (Trusts/Trustees Opp'n at 15 ("Considering class certification issues first, followed by any standing issues, is not contrary to the Ninth Circuit's decision in Easter."); but see Easter, 381 F.3d at 962 (Section Heading: "The District Court Properly Considered Standing Before Class Issues").) Despite being aware of binding case law that squarely rejected Plaintiff's position, counsel argued the position to this Court without attempting to distinguish Easter or even mentioning its clear rejection of the position.

Ninth Circuit case law clearly and unambiguously forecloses Plaintiff's arguments on her standing to sue the Class-Only Trusts. Plaintiff's assertion of these arguments, supported only by misstatements and mischaracterizations of law, unnecessarily consumed both the parties' and the Court's time and resources. Going forward, the Court trusts that all counsel will remain mindful of their duties as participants in the justice system, duties arising not only from Rule 11 but also from the ethical mandates governing all members of the bar.

Because Plaintiff lacks standing to assert claims against the Class-Only Trusts, those claims are dismissed without leave to amend.

## B.   Other Defendants

With respect to the remaining Defendants, the Court does not reach a final determination of Plaintiff's standing or the viability of Plaintiff's claims. It is up to Plaintiff to choose the proper parties to sue, which requires making a good faith determination of whether there are nonfrivolous arguments to support a claim against each potential defendant. The role of the Court is to resolve genuine disputes between parties, not to choose defendants for a prospective plaintiff. Plaintiff's claims against the Class-Only Trusts evidence a failure to exercise reasonable discretion in determining what claims to bring, as no reasonable interpretation of Ninth Circuit law would support Plaintiff's standing to assert those claims.

Because it is for Plaintiff to determine, in the first instance, the parties against whom she holds nonfrivolous claims, the Court declines to perform such preliminary functions on Plaintiff's behalf. Rather, the Court dismisses Plaintiff's claims against the remaining Defendants with leave to amend. The Court trusts that, given this opportunity, Plaintiff's

**CIVIL MINUTES**
                                              **GENERAL**            Initials of Deputy Clerk MG/wr

counsel will determine in good faith which potential claims are supported by nonfrivolous arguments and will choose the proper Defendants accordingly.

Of course, the arguments necessary to support a claim need not be compelling, nor even persuasive. As already noted, Plaintiff may rely on "reasonable, albeit unpersuasive, interpretations of the law." Premier Commercial Corp. v. FMC Corp., 139 F.R.D. 670, 672 (N.D. Cal. 1991). But this analysis must be undertaken in good faith, not treated as an empty formality.

## VI.   AMENDING THE COMPLAINT

Because the SAC is being dismissed for the reasons stated above, the Court has no cause to reach Defendants' other arguments for dismissal. However, in the interest of efficiency, the Court discusses here several specific deficiencies identified by Defendants, of which Plaintiff is now on notice and would do well to address when amending the complaint.

### A.   Plaintiff's Use of the Collective Term "Sallie Mae"

First, Defendants object that Plaintiff's reference to the collective entity "Sallie Mae" fails to put them on fair notice of each Defendant's alleged wrongdoing. (See, e.g., NSI's MTD at 4.) Plaintiff defines the collective term "Sallie Mae" as follows:

> "Sallie Mae" refers collectively to SLM Corporation ("SLM Corp."), and the wholly-owned subsidiaries of SLM Corp. involved in the activities described below, including the Student Loan Marketing Association, SLM Education Credit Finance Corporation, and Sallie Mae, Inc., and their successors in interest, as identified below, including Navient Corporation.

(SAC ¶ 1 n.1.)

Of course, there is nothing generally wrong with defining a collective term for the sake of brevity, as long as no ambiguity or confusion is introduced by the term. However, Plaintiff's use of "Sallie Mae" in various contexts does introduce ambiguities, making confusion quite likely. It appears Plaintiff actually uses the term "Sallie Mae" to refer variously to different subgroups of one or more Defendants, with the actual referent varying by context. To cite a few examples:

1. "The LPA [Loan Purchase Agreement] identified and referred to SLMA as Sallie Mae." (SAC ¶ 84.)

   If Plaintiff's definition of "Sallie Mae" is applied here, then the LPA identified and referred to SLMA collectively as SLM Corp. and the wholly-owned subsidiaries of SLM Corp. involved in the activities described below, including the Student Loan Marketing Association, SLM Education Credit Finance Corporation, and Sallie Mae, Inc., and their successors in interest, as identified below, including Navient Corporation.

   It seems unlikely Plaintiff intended this interpretation. The more likely

**CIVIL MINUTES**
                                                **GENERAL**           Initials of Deputy Clerk MG/wr

interpretation is that, within the context of the LPA, the term "Sallie Mae" takes on a different meaning than Plaintiff's definition. Accordingly, in all subsequent paragraphs, it is unclear if the controlling definition of "Sallie Mae" is Plaintiff's earlier definition or the LPA's definition.

2. In some paragraphs, context suggests that the term "Sallie Mae" adopts the LPA's definition and refers only to SLMA. (See, e.g., SAC ¶ 90 ("[T]he LPA evinces that Sallie Mae, not Sioux Falls Bank, was the de facto, actual lender.") (internal quotations omitted); SAC ¶ 109 ("Sallie Mae purchased the loans at cost, consistent with it being the de facto, actual lender.").)

   However, even assuming that "Sallie Mae" refers to SLMA in these paragraphs, ambiguity remains, because earlier in the SAC Plaintiff alleges that "SLM ECFC became the purchaser of the Private Credit Student Loans made pursuant to a confidential addendum to the LPA, as of March 31, 2004." (SAC ¶ 47(a).) Accordingly, in paragraph 90, "Sallie Mae" might refer only to SLMA or it might refer to SLMA with respect to loans purchased prior to March 31, 2004, while referring to SLM ECFC with respect to loans purchased after March 31, 2004.

3. In some paragraphs, "Sallie Mae" seemingly refers either to SLMA or to Sallie Mae Servicing LLP, or potentially to some combination of the two of them. (Compare, e.g., ¶ 103 ("Sallie Mae services all of the loans, and maintains custody of the loan documents.") with SAC ¶ 176 ("Sallie Mae, operating as Sallie Mae Servicing LLP and later as Sallie Mae, Inc. has serviced Plaintiff's Private Credit Student Loan since inception.").)

4. In some parts of the SAC, "Sallie Mae" appears to take on different meanings within a single paragraph. (See, e.g., SAC ¶ 92 ("The LPA provides that Sallie Mae will originate Sallie Mae-branded Private Credit Student Loans . . . .").)

   In this context, the first use of "Sallie Mae" appears to refer to SLMA (or possibly, as discussed above, SLMA and SLM ECFC at various times), while the second use of "Sallie Mae" appears to refer to the name "Sallie Mae" as a trademark.

5. In some paragraphs, "Sallie Mae" appears to refer to SLM Corp. (Compare, e.g., SAC ¶ 174 ("The loan[] was made by Sallie Mae, or its predecessor in interest, the Student Loan Marketing association . . . .") with SAC ¶ 45(b) ("SLM Corp., or its predecessor in interest, the Student Loan Marketing Association . . . .").)

6. In some paragraphs, "Sallie Mae" appears to refer to Navient Solutions, Inc. and its predecessors in interest. (Compare, e.g., SAC ¶ 176 ("Sallie Mae, operating as Sallie Mae Servicing LLP and later as Sallie Mae, Inc. has serviced Plaintiff's Private Credit Student Loan since inception.") with SAC ¶ 46(a) ("Defendant Navient Solutions, Inc. is the successor entity to Sallie Mae, Inc.").)

7. In some paragraphs, "Sallie Mae" appears to refer to the Navient Defendants, but not to their predecessors in interest. (<u>See, e.g.</u>, SAC ¶ 220 (requesting that the Court "enjoin Sallie Mae from continuing to violate the Unfair Competition Law as discussed herein").)

8. In some paragraphs, "Sallie Mae" could refer to different entities depending on how the rest of the paragraph is interpreted. (<u>See, e.g.</u>, SAC ¶ 189 ("Sallie Mae charged Plaintiff interest . . . .").)

"Sallie Mae" here could mean the noteholder of Plaintiff's loan, in which case "Sallie Mae" refers to one or more of SLMA, SLM ECFC, SLM Corp, Navient Corp, and/or one of the Trust Defendants.[13]

"Sallie Mae" could also mean the servicer of Plaintiff's loan, who collected the actual interest on behalf of the noteholder, in which case "Sallie Mae" refers to one or more of Sallie Mae Servicing LLP; Sallie Mae, Inc.; and/or NSI.

Because "Sallie Mae" is used throughout the SAC without any consistent meaning, it is difficult to determine the role of each Defendant with respect to Plaintiff's loan. It may be that, under Plaintiff's interpretation of the governing law, the distinctions between these entities is irrelevant for establishing liability. However, it is clear from Defendants' motions that they take a very different view of the law, rendering the specific roles of the various Navient Defendants highly relevant. Accordingly, should Defendants' interpretation of the law prove more persuasive, the Court will have to determine its application to each of the Defendants individually. If the allegations in the operative complaint do not allow the Court to determine whether each individual Defendant is potentially liable, the complaint will have to be dismissed.

The Court leaves resolution of this issue to counsel's discretion, but notes that a complete restructuring of the complaint is almost certainly unnecessary. It may be sufficient to simply replace each use of the term "Sallie Mae" with its intended referent, or alternatively, to add footnotes explaining the intended referent in each instance.

### B. Failure to Name Trustee Defendants in their Proper Capacity

Trustee Defendants object that they have not been named in their capacities as trustees for the trust holding Plaintiff's loan. Rather, they have been named in their individual capacities, without any allegations to support individual liability. (Trusts/Trustees' MTD at 12-14.) Plaintiff responds that it is "apparent from the SAC although not stated expressly [that] Plaintiff sues the BNY Defendants in their representative capacity." (Trusts/Trustees MTD at 7.) Because the Court is granting leave to amend, Plaintiff has the opportunity to address this issue and expressly state the capacity in which the Trustee Defendants are named as parties.

---

[13] The SAC does not specify the ultimate holder of the note, nor does it specify the holder of the note at the time the allegedly usurious interest was charged.

**C.    Plaintiff's Failure to Allege Receipt of Usurious Interest**

Multiple Defendants object that the SAC contains no allegations that they ever received usurious interest on Plaintiff's loan. (See, e.g., Trusts/Trustees' MTD at 6, 9; Navient Affiliates' MTD at 11, 12, 13.) For some Defendants, this may be due to Plaintiff's ambiguous use of the term "Sallie Mae." For these Defendants, Plaintiff's disambiguation of this term should effectively solve the issue.

However, there are some Defendants who may not have actually received any interest on Plaintiff's loan in any capacity. For instance, if SLMA acquired Plaintiff's loan before SLM ECFC took over SLMA's role under the LPA, then it is implausible that SLM ECFC ever held any interest in Plaintiff's loan or received interest on it. Similarly, if Plaintiff's loan was securitized before its interest rate rose above 10%, then it is implausible that SLMA ever received any usurious interest on Plaintiff's loan. Because the Court is granting leave to amend, counsel will have the opportunity to determine whether Plaintiff has any viable claims against these entities and, if so, to add allegations supporting the conclusion that they received usurious interest.

Additionally, the SAC alleges that Defendant NIC holds Excess Distribution Certificates on SLM Private Credit Student Loan Trusts, (SAC ¶ 140), which entitle NIC to "the balance of funds remaining after payment of trust expenses and distributions to the noteholders, (SAC ¶ 139). However, the SAC does not allege that any excess distributions were ever made from the 2003-B Trust, let alone whether such distributions took place during or following a month when the trust received allegedly usurious interest from Plaintiff. Without any allegations linking NIC to usurious interest paid by Plaintiff, there is no plausible claim for relief against NIC. If Plaintiff intends to name NIC as a Defendant after amending the complaint, Plaintiff should ensure that the newly amended complaint contains factual allegations sufficient to render her claims against NIC plausible.[14]

**VII.    SUBSEQUENT MOTIONS TO DISMISS**

Because there is likely to be another round of motions to dismiss upon the filing of a third amended complaint, the Court also takes this opportunity to identify several unaddressed issues that are likely to arise again. The Court identifies them below so that both Plaintiff and Defendants can address these open questions in any subsequent motions.

**A.    Liability under State Law vs Article III Standing**

At multiple places in Defendants' briefs, arguments regarding Article III standing are intermixed with questions of liability under state law. These are two distinct questions. Cf., e.g., Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 96 (1998) (distinguishing failure to state a claim from lack of standing, stating: "In Bell, . . . the

---

[14] The Court notes that, before any discovery takes place, Plaintiff may not be in a position to make such allegations consistent with Rule 11. This is, of course, understandable. The proper course in that case is to seek leave to amend and add defendants upon discovering facts adequate to support claims against those defendants.

**CIVIL MINUTES**
                                        **GENERAL**                Initials of Deputy Clerk MG/wr

District Court had dismissed the case on <u>jurisdictional</u> grounds because it believed that (what we would now call) a <u>Bivens</u> action would not lie. This Court held that the nonexistence of a cause of action was no proper basis for a jurisdictional dismissal. Thus, the uncertainty [in Bell] about 'whether the plaintiff's injuries can be redressed' [was] simply the uncertainty about whether a cause of action existed—which is precisely what <u>Bell</u> holds <u>not</u> to be an Article III 'redressability' question. It would have been a different matter if the relief <u>requested</u> by the plaintiffs in <u>Bell</u> (money damages) would not have remedied their injury in fact, but it of course would.") (emphasis in original) (citing <u>Bell v. Hood</u>, 327 U.S. 678 (1946)).

Of course, these questions, though distinct, often carry overlapping considerations. <u>Cf., e.g.</u>, <u>Warth v. Seldin</u>, 422 U.S. 490, 500 (1975) ("Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.") (internal citations omitted). But despite this partial overlap of considerations, the two questions—whether there is "a causal connection between the injury and the conduct complained of," <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992), and whether state law imposes liability on a particular defendant for the conduct complained of—are two separate and independent questions. In any subsequent motions to dismiss, the parties' should remain clear on which arguments speak to Plaintiff's standing and which arguments speak to liability as a matter of state law.

**B.   Statute of Limitations**

The argument that Plaintiff's claims are time-barred appears to be the only argument raised by every Defendant in this action, which suggests it is nearly certain to be raised again with respect to the third amended complaint. However, certain critical questions remained unaddressed in the parties' briefing, questions which almost certainly would have required additional briefing had the Court attempted to decide this issue on the present papers. The Court identifies these questions below so that they may be addressed if and when this argument is reasserted against the third amended complaint.[15]

Defendants contend that the statute of limitations has run on all of Plaintiff's claims because the longest limitations period among her claims is four years and Plaintiff last paid interest above 10% over seven years ago. (NSI's MTD at 11-12.) In response, Plaintiff invokes three equitable exceptions to the limitations period: the continuing violations doctrine, the discovery rule, and the doctrine of fraudulent concealment. (Doc. No. 33 ("NSI Opp'n") at 8, 9, 15.)

> The limitations period, the period in which a plaintiff
> must bring suit or be barred, runs from the moment a claim

---

[15] The Court notes that these questions may have been left unanswered because there is no governing authority addressing them directly. If that is the case, it would be helpful for the parties to identify the absence of authority directly on point and to address how the open question or questions should be approached.

**CIVIL MINUTES
GENERAL**          Initials of Deputy Clerk MG/wr

> accrues. Traditionally at common law, a cause of action accrues when it is complete with all of its elements—those elements being wrongdoing, harm, and causation. This is the "last element" accrual rule: ordinarily, the statute of limitations runs from the occurrence of the last element essential to the cause of action.
>
> To align the actual application of the limitations defense more closely with the policy goals animating it, the courts and the Legislature have over time developed a handful of equitable exceptions to and modifications of the usual rules governing limitations periods. These doctrines may alter the rules governing either the initial accrual of a claim, the subsequent running of the limitations period, or both. The most important of these doctrines, the discovery rule, where applicable, postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. . . . The doctrine of fraudulent concealment tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale. The continuing violation doctrine aggregates a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them.

Aryeh v. Canon Bus. Solutions, Inc., 55 Cal. 4th 1185, 1191-92 (2013) (internal quotations, citations, and alterations omitted).

The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." Id.  A "plaintiff discovers a cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least suspects that someone has done something wrong to him." Norgart v. Upjohn Co., 21 Cal.4th 383, 397-98 (1999) (internal quotations omitted).

Plaintiff argues that, until the Loan Purchase Agreement became public on November 28, 2013, she had no way of knowing that her de facto lender was not a national bank and was therefore subject to California usury law. Thus, she argues, she discovered the cause of action on November 28, 2013, making her claims timely. Defendants argue that, since the "wrong" alleged is charging interest in excess of 10%, Plaintiff learned of the wrongs when she paid the interest and therefore discovered the causes of action as they occurred. (NSI's MTD at 14-15.) According to Defendants, Plaintiff's de facto lender theory is not an essential element of Plaintiff's cause of action, but rather an answer to the affirmative defense of preemption.

The Court notes the following questions, which were not addressed or were insufficiently addressed in the parties' briefs:

1. Is Plaintiff's <u>de facto</u> lender theory necessary to establish her claim for usury under state law? <u>See, e.g.</u>, Cal. Const. art. XV, § 1 (exempting certain bank loans from California's usury laws).

2. Is Plaintiff's <u>de facto</u> lender theory necessary to avoid preemption under the National Bank Act? <u>See</u> 12 U.S.C. § 85 (addressing the interest a national bank "may take, receive, reserve, and charge on any loan," but not addressing the interest non-national-bank assignees of the loan may charge).

3. Assuming Plaintiff's <u>de facto</u> lender theory is not necessary under state law, but is necessary to avoid federal preemption, to what extent do California Courts take notice of the potential for federal preemption when applying equitable exceptions to limitations periods? <u>See, e.g.</u>, <u>Aryeh</u> 55 Cal. 4th at 1193-94 ("It thus appears the Legislature, by passing a bare-bones limitations statute and delegating to the judiciary the task of defining the point of accrual in particular cases, left courts free to determine whether the circumstances in each case call for application of either the general last element rule of accrual or any of its equitable exceptions."); <u>cf. also</u> <u>Garver v. Brace</u>, 47 Cal.App.4th 995, 999 (1996) ("As a general rule, the statute of limitations cannot run before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment . . . .") (internal quotations omitted).

4. Were the facts available to Plaintiff before the LPA became public sufficient to establish Plaintiff's <u>de facto</u> lender theory as a matter of California state law? <u>Cf., e.g.</u>, <u>Easter v. American West Financial</u>, 381 F.3d 948, 955 (9th Cir. 2004) (noting that, under Washington usury law, "the determinative question is who bears the risk of the transaction").

5. Were the facts available to Plaintiff before the LPA became public sufficient to establish Plaintiff's <u>de facto</u> lender theory for purposes of overcoming preemption by the National Bank Act?

Answering these questions clearly will facilitate expeditious resolution of any disputes that may arise regarding the timeliness of Plaintiff's claims under the third amended complaint.

## VIII.   CONCLUSION

Defendants' motions to dismiss are granted. Plaintiff may amend with respect to all Defendants except the trusts that never owned her loan. Any amended complaint must be filed no later than August 4, 2015.