1  Andrew Friedman, admitted *pro hac vice*
       Email: afriedman@cohenmilstein.com
2  Douglas McNamara, admitted *pro hac vice*
       Email: dmcnamara@cohenmilstein.com
3  Sally M. Handmaker (SBN 281186)
       Email: shandmaker@cohenmilstein.com
4  COHEN MILSTEIN SELLERS & TOLL, PLLC
5  1100 New York Ave., Suite 500
   Washington, D.C. 20005
6  Telephone: 202-408-4600
7

8  Michael D. Braun (SBN 167416)
       Email: mdb@braunlawgroup.com
9  BRAUN LAW GROUP, P.C.
10 10680 West Pico Boulevard, Suite 280
   Los Angeles, California 90064
11 Telephone: 310-836-6000
12 Attorneys for Plaintiff Marlene Blyden
   (Additional Counsel Listed On Following Page)
13

14                  UNITED STATES DISTRICT COURT

15                 CENTRAL DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| 17 MARLENE BLYDEN, on behalf of herself and all others similarly situated, | CASE NO: 5:14-CV-2456-JGB (KKx) |
| 18              Plaintiff, | |
| 19        v. | CLASS ACTION |
| 20 NAVIENT SOLUTIONS, INC.; SLM PRIVATE CREDIT STUDENT LOAN TRUST 2003-B; and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., In Its Representative Capacity As TRUSTEE FOR SLM PRIVATE CREDIT STUDENT LOAN TRUST 2003-B, | THIRD AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE AND INJUNCTIVE RELIEF |
| 21 | |
| 22 | |
| 23 | DEMAND FOR JURY TRIAL |
| 24 | |
| 25 | |
| 26              Defendants. | |

27

28

1 | Additional Counsel of Record

2 | William J. Genego (SBN103224)
3 |   Email: bill@genegolaw.com
LAW OFFICE OF WILLIAM GENEGO
4 | 2115 Main Street
5 | Santa Monica, California 90405
Telephone:  310-399-3259
6 |

7 | Evan A. Jenness (SBN 136822)
     Email: evan@jennesslaw.com
8 | LAW OFFICES OF EVAN A. JENNESS
9 | 2115 Main Street
Santa Monica, California 90405
10 | Telephone:  310-399-3259

11 |

12 | Janet Lindner Spielberg (SBN 221926)
     Email: jlspielberg@jlslp.com
13 | LAW OFFICES OF JANET LINDNER SPIELBERG
12400 Wilshire Boulevard, # 400
14 | Los Angeles, California 90025
Telephone: 310-392-8801

Plaintiff Marlene Blyden, by her attorneys, brings this action against Defendants Navient Solutions, Inc., SLM Private Credit Student Loan Trust 2003-B, and The Bank of New York Mellon Trust, N.A., in its representative capacity as Trustee for the SLM Private Credit Student Loan Trust 2003-B (collectively, "Defendants"), on her own behalf and on behalf of all others similarly situated, and based upon her knowledge and the investigation of counsel alleges as follows:

## I.    Introduction

1.    Plaintiff, while a California resident, signed a loan contract in July 2002, to borrow money to pay for tuition and other educational expenses in connection with her attendance at DeVry University in California.  Exhibit A (loan contract consisting of Application Page and Promissory Note). The contract identified the lender as "FNB Sioux Falls, Sioux Falls, SD" ("Sioux Falls National Bank" or "SFNB"). Ex. A, p. 1.

2.    The loan is to be repaid in monthly installments of equal amounts over the term of the loan. Ex. A, p. 2.

3.    The contract provides that the interest rate will be the Prime Rate plus a fixed margin set at the time the loan was made (which in Plaintiff's case was 2%), and will be adjusted quarterly to reflect any changes in the Prime Rate. Ex. A, p. 2.

4.    The California Constitution, art. XV, § 1, sets the maximum rate of interest at 10% per annum for loans such as those used to pay for educational expenses, but that limitation does not apply to loans made by banks licensed under the laws of California, the United States of America or another state.

5.    The National Bank Act ("NBA"), 12 U.S.C. § 85, allows national banks to charge interest at the rate allowed by the laws of their home state and preempts other states' usury laws.

6.    The contract contains a provision that allows the lender to assign the contract at any time. By law, an assignee obtains any exemption the assignor may have from state usury laws under the NBA.

1

7.      Plaintiff's loan contract was assigned or otherwise transferred from Sioux Falls National Bank to the Student Loan Marketing Association ("SLMA"), shortly after the funds were disbursed.

8.      Sometime thereafter, Plaintiff's loan was assigned or otherwise transferred to the SLM Private Credit Student Loan Trust 2003-B.

9.      Defendant Navient Solutions, Inc. ("Navient Solutions" or "NSI"), or one of its predecessors in interest identified below, has been serviced Plaintiff's loan since its inception. As the servicer, NSI charges and receives Plaintiff's payments on her loan, including fees, interest and principal.

10.     From July 1, 2006 to September 30, 2007, NSI's predecessor, Sallie Mae, Inc. ("SMI"), charged Plaintiff interest at an annual rate of 10.25%.

11.     Plaintiff made payments to SMI which included the payment of interest that had been charged at an annual rate of 10.25%, and the payments were received by SMI.

12.     SMI transferred Plaintiff's payments, including interest that had been charged at a rate exceeding 10% per annum, to the SLM Private Credit Student Loan Trust 2003-B.

13.     In November 2013, a document entitled "Loan Purchase Agreement of January 1, 2002" between Sioux Falls National Bank and the SLMA became publicly available, and revealed that Plaintiff's loan was originated and made pursuant to that Loan Purchase Agreement ("LPA").  Exhibit B (Loan Purchase Agreement).

14.     The LPA provided, *inter alia*, that the SLMA would originate Private Credit Student Loans as the exclusive agent for SFNB, and that SFNB would not originate or make any other "Private Credit Student Loans."[1] Further, under the

---

[1] "Private Credit Student Loans" as used throughout this Third Amended Complaint refers to loans that were made under the LPA, and (a) are neither

terms of the LPA, SFNB had no risk of loss as to the loans; the SLMA provided the funds for the loans; the SLMA acquired a participation interest in the loans when the funds were disbursed; and SFNB was required to, and did, sell, assign or otherwise transfer the loans at cost to the SLMA within 60 days of disbursement.

15.     These facts and others detailed below establish that the substance of the transaction was that the SLMA, not SFNB, was the lender and made Plaintiff's Private Credit Student Loan. The loan therefore is subject to and not exempt from the California's usury limit of 10% per annum, and the interest charged on Plaintiff's loan at a rate exceeding 10% per annum was usurious and illegal.

16.     Further, because SFNB was not the actual lender and did not make Plaintiff's loan, and instead the SLMA was the de facto lender, the loan is not subject to the interest preemption provision of the National Bank Act.

17.     Under the LPA, the SLMA used Sioux Falls National Bank as a nominee to make it appear as if the loans were made by a national bank and not subject to state law, so that the SLMA could make loans to California borrowers while evading California State laws, including those pertaining to usury.

18.     At least 68,000 Private Credit Student Loans were made under the LPA to California borrowers using Sioux Falls Nation Bank as the nominee lender.

19.     NSI, and its predecessors in interest, including SMI, charged Plaintiff and members of the Class interest at a rate exceeding 10% per annum on their Private Credit Student Loans, in violation of California law.

20.     The usurious rate of interest caused an excessive portion of payments made by Plaintiff and Class members to be applied to interest rather than principal.

---

Federal Family Education Loans, nor insured or guaranteed by a government unit or nonprofit institution, and (b) were sold, assigned or otherwise transferred from Sioux Falls National Bank to the SLMA or the entity that replaced that role of the SLMA under the LPA.

21.     The application of payments to interest that should have been applied to reduce principal caused a continuing and ongoing harm to Plaintiff and Class members, as the outstanding principal determines (together with the rate of interest) the total amount that is charged to a borrower.

22.     When borrowers deferred or failed to make timely payments of the usurious interest, the interest was added to the loan principal (*i.e.*, capitalized or compounded), and interest was then charged on the usurious interest that had become part of the principal.

23.     As a result of its illegal conduct in charging usurious interest rates, NSI and its predecessors collected, and continue to collect, millions of dollars to which they were and are not entitled.  In so doing, NSI has wrongfully acquired property from the borrowers – the rightful owners of the property – in which it did and does not have an ownership interest.

24.     NSI is paid a monthly fee for servicing the Private Credit Student Loan of Plaintiff and the Class. The servicing fee is a percentage of the outstanding principal.

25.     Because NSI's servicing fee is a percentage of the outstanding principal, NSI benefits from usurious interest charged. If the interest rate were limited to 10%, more of each borrowers' payment would be applied to principal, thereby reducing the principal and resulting in NSI receiving a lower fee for the same servicing.

26.     This action seeks to recover damages from Defendants for Plaintiff and members of the Class who were charged and paid interest charged at a usurious rate on Private Credit Student Loans, and to enjoin and prevent NSI from charging Plaintiff and Class members interest in excess of 10% per annum.

## II.    PARTIES

27.    **Plaintiff Marlene Blyden** ("Plaintiff") is a citizen of the State of California residing in Riverside County, California. Plaintiff has an outstanding and active Private Credit Student Loan.

28.    Plaintiff was a citizen and resident of the State of California at the time she signed the loan contract on July 3, 2002.

29.    Plaintiff has been charged interest at a rate exceeding 10% per annum for at least one or more quarterly periods, and has paid such interest.

30.    **Defendant Navient Solutions, Inc.** ("Navient Solutions" or "NSI") is a Delaware Corporation. It is the successor entity to Sallie Mae, Inc. ("SMI"), which serviced Plaintiff's Private Credit Student Loan prior to NSI.  The entity that serviced Plaintiff's loan prior to SMI, Sallie Mae Servicing, LLP, was a subsidiary of the SLMA, and was merged into Sallie Mae, Inc. Thus, from its inception to the present, NSI or one of its predecessors has serviced Plaintiff's Private Credit Student Loan.[2]

31.    NSI charged Plaintiff and putative class members interest at a rate exceeding 10% per annum, and received payments from Plaintiff and Class members that included interest that was charged at a rate exceeding 10% per annum.

32.    **SLM Private Credit Student Loan Trust 2003-B** ("2003-B Trust") is a Delaware statutory trust. Plaintiff's Private Credit Student Loan was assigned or otherwise transferred to the 2003-B Trust by the SLMA directly or through another

---

[2] All subsequent references in this Third Amended Complaint to "NSI" or "Navient Solutions" includes its predecessors in interest, specifically SMI and Sallie Mae Servicing, LLP, unless expressly stated otherwise. References solely to Navient Solutions, Inc. will be made in its full name, *i.e.*, Navient Solutions, Inc.

1   entity or entities. The 2003-B Trust continues to be the counter-party to Plaintiff's

2   loan contract.

3       33.    On information and belief, the 2003-B Trust owns Private Credit

4   Student Loans of members of the Class, and received and continues to receive

5   interest charged at a usurious rate.

6       34.    **The Bank of New York Mellon Trust Company, N.A.,** is the trustee for

7   Defendant SLM Private Credit Student Loan Trust 2003-B.

8       35.    As the trustee, and pursuant to a trust agreement, The Bank of New

9   York Mellon Trust Company, N.A., carries out the business of the 2003-B Trust,

10  and it may sue or be sued on behalf of the 2003-B Trust. It is sued here in its

11  representative capacity.

12

13  ### III.   JURISDICTION AND VENUE

14      36.    Jurisdiction of this Court is proper under 28 U.S.C. § 1332 as there is

15  diversity of citizenship between the parties.  Plaintiff Marlene Blyden is a citizen of

16  California residing in Riverside County. Defendant Navient Solutions, Inc. is

17  incorporated in the State of Delaware and has its primary offices in Newark,

18  Delaware.

19      37.    The SLM Private Credit Student Loan Trust 2003-B was established in

20  Delaware.

21      38.    The 2003-B Trust received and continues to receive interest and

22  principal payments made in California on Private Credit Student Loans.

23      39.    The Bank of New York Mellon Trust Company, N.A is based in Los

24  Angeles, California.

25      40.    Upon information and belief, the amount in controversy exceeds

26  $5,000,000 for Plaintiff and Class members collectively, exclusive of interest and

27  costs, by virtue of the revenue and profits reaped by Defendants from their

28

transactions with Plaintiff and the Class as a direct and proximate result of their wrongful conduct, and by virtue of the injunctive and equitable relief sought.

41.     Upon information and belief, based upon the number of Private Credit Student Loans, the total number of Class members is likely to number in the thousands if not tens of thousands.

42.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).  Defendant NSI transacts business within this district. A substantial portion of the underlying transactions and events complained of occurred in this district, and affected persons reside or resided, in this district.

## IV.     FACTUAL ALLEGATIONS

### A.     SLMA Privatization

43.     The SLMA was created pursuant to federal statute and chartered by the federal government as a government sponsored enterprise ("GSE"). The SLMA was prohibited by statute from originating loans.

44.     In or about 1994, Congress required the SLMA to transition to a wholly private company no later than September 30, 2008.

45.     As part of the transition, various segments and subsidiaries of the SLMA were acquired by the SLM Corporation ("SLM Corp.") or merged into its subsidiaries. SLM Corp. was a parent holding company, which was to, and did, operate as the parent holding company of the privatized operations of the SLMA after the SLMA's dissolution.

46.     Beginning no later than 2002, the SLM Corp. sought to acquire or establish a bank to enable it to operate as a lender, but it was not permitted to do so by the United States Department of the Treasury until after the SLMA's dissolution.

47.     The SLMA and SLM Corp. and its wholly-owned subsidiaries knew that if they made loans to students the loans would be subject to California State law, and they could not avail themselves of the exemptions for bank lenders under

7

1    state law or the NBA. Rather than comply with California law, the SLMA and the

2    SLM Corp., and its wholly-owned subsidiaries, sought to circumvent the law by

3    entering into forward purchase agreements with so-called lender partners, to make

4    it appear as if the lender was a national bank.

5        48.    One such forward purchase agreement was the LPA between the

6    SLMA and the First National Bank, Sioux Falls, located in Sioux Falls, South

7    Dakota. See Ex. B.

8        **B.    The Substance of the LPA**

9        49.    The LPA was effective January 1, 2002. Ex. B, p. 1.

10       50.    The LPA provided that the SLMA would originate Private Credit

11   Student Loans on behalf of Sioux Falls National Bank. Ex. B, p. 2.

12       51.    Sioux Falls National Bank designated the SLMA as its "exclusive agent

13   for the marketing of the Lender's services as a source of Loans made in accordance

14   with the Loan Program Plan," and SFNB agreed that it "will not itself, nor will it

15   permit any other party to conduct marketing activities for such services." Ex. B, p. 5.

16       52.    Sioux Falls National Bank granted the SLMA a power of attorney

17   which conferred "all reasonably necessary authority to act as the Lender's agent and

18   attorney-in-fact in fulfilling Sallie Mae's [*i.e.*, the SLMA's] obligations with respect to

19   Loans Sallie Mae is originating or servicing" on behalf of SFNB. Ex. B, p. 6.

20       53.    The SLMA determined which loans should be approved and in what

21   amount, and after doing so the SLMA issued a disbursement report to Sioux Falls

22   National Bank. The disbursement report included the type of disbursement, the

23   number of disbursements, and the amounts to be disbursed, together with a

24   certificate from the SLMA that all loan documents were properly executed. Ex. B, p.

25   2. The SLMA also sent SFNB a disbursement roster, which identified the

26   disbursement amounts. Ex. B, p. 2.

27       54.    Simultaneously with forwarding the disbursement report and roster to

28   Sioux Falls National Bank, the SLMA created a credit in a SFNB account, referred

to as the Lender's Account. The amount of the credit was the amount the SLMA was required to pay SFNB for its participation interest in the loans under the terms of the "Participation Agreement." Ex. B, p. 2. The SLMA would simultaneously debit the Lender's Account to a disbursement account in the name of and controlled by the SLMA in the amount required for disbursement of the Loans. Ex. B, pp. 2-3.

55.     Sioux Falls National Bank had a participation limit of $5,000,000, and the SLMA had a 100% participation interest in all loans that were funded above SFNB's participation limit. Ex. B, pp. 2-3.

56.     Accordingly, once the disbursements exceeded $5,000,000, the SLMA would deposit the amount of the funds to be disbursed as loans into the "Lender's Account" as supposed payment to Sioux Falls National Bank for the SLMA's 100% participation interest in the loans, and simultaneously transfer from the Lender's Account to the SLMA's disbursement account the amount needed to fund the loans. The SLMA would then fund the loans from that disbursement account, by transferring funds to schools and borrowers. In other words, once Sioux Falls National Bank reached its participation limit of $5,000,000, the SLMA would deposit the full amount to be loaned into the Lender's Account, and simultaneously withdraw that amount to fund the loans and acquire a 100% participation in the loans.[3]

57.     The SLMA Mae paid Sioux Falls National Bank an amount equal to the accrued interest on the bank's $5,000,000 participation interest, on an ongoing basis, not connected to any particular loans. This amount was, in effect, payment by the SLMA to SFNB for using its charter to make it appear as if the loans were made by a national bank and not subject to state law.

_____

[3] The $5,000,000 participation limit was subsequently increased to $10,000,000 by an amendment to the LPA in January 1, 2003.

58.    The timing of the credits further evinces that the SLMA's funds were the source of the loans. Under the terms of the LPA, if the credit from the SLMA did not settle prior to 12:00 noon Central time on the date that the debit from the Lender's Account was to settle, Sioux Falls National Bank was to notify the SLMA by telephone, and the SLMA was "obligated to wire such funds to Lender's Account by federal funds wire by 1:00 p.m. Central time." Ex. B, p. 3. If the funds were not sent by that time, SFNB was allowed to "return Sallie Mae's debit from the Lender's Account that was scheduled to settle that day." Ex. B, p. 3.

59.    The loan sales were initiated by the SLMA providing Sioux Falls National Bank with a list of loans subject to next scheduled monthly sale.  Sioux Falls National Bank would be deemed to have purchased all of the loans unless it provided notice to the SLMA within 10 days. Ex. B, pp. 8-9.

60.    Sioux Falls National Bank assigned its full interest to the SLMA as of the date of the sale, and the assignment was accomplished by the SLMA signing notes pursuant to a power of attorney, and authorizing the sale of the loans. Ex. B, pp. 8-9.

61.    The price the SLMA would pay Sioux Falls National Bank was the principal, plus interest which had accrued on the loans that were payable by the borrowers, less the amount that the SLMA paid SFNB for its participation interest. Ex. B, p. 17. In other words, the SLMA purchased the loans at cost. Sioux Falls National Bank received no premium or profit from selling or transferring the loans, as would be expected if SFNB was the original lender or had actually made the loans.

62.    Other than the interest payment on the $5,000,000 that the SLMA made to rent Sioux Falls National Bank's charter, all remaining funds were retained by the SLMA.

63.    Under the LPA, Sioux Falls National Bank did not have any risk of loss with respect to the loans because, *inter alia*, the SLMA provided the funds for the

10

loans and was obligated to purchase the loans; SFNB was made the beneficiary of the insurance on the loans before they were assigned; and the SLMA indemnified SFNB for misrepresentations and omissions in loan documents.

64.     The loans were insured against risk of default with funds paid by borrowers. Payment to the insurer was accomplished by the SLMA depositing funds received from the borrowers for payment of the insurance into an SLMA account, and paying the insurer such sums. Even though Sioux Falls National Bank, as the purported lender, was the beneficiary of the insurance, it did not pay for the insurance, either directly or indirectly. Ex. B, p. 3.

65.     The LPA provides that the SLMA or one of its designated subsidiaries shall service all of the Private Credit Student Loans. Ex. A, p. 4. The SLMA or one of its designated subsidiaries collects all payments from the borrower or any other party with respect to such loans. Ex. B, p. 4.

66.     On or about March 31, 2004, a confidential addendum to the LPA replaced the SLMA with two entities, SMI, and SLM Education Credit Finance Corporation ("SLM ECFC"), both of which were wholly-owned subsidiaries of the SLM Corp. Thereafter, SMI serviced the Private Credit Student Loans, and SLM ECFC assumed the SLMA's prior role in making and transferring the Private Credit Student Loans.

67.     The SLMA and its successor under the LPA made approximately 68,000 Private Credit Student Loans to California residents.

## C.     The Securitization Program

68.     In order to obtain funds for the SLMA and its successor to make loans, the SLM Corp. used a securitization program, which raised funds by selling interest-bearing notes to investors.  Interest on the notes was paid from payments on student loans.

69.     At a meeting on July 25, 2002, the SLM Corp. Board of Directors voted to authorize SLM Corp or its subsidiaries to establish one or more subsidiary

corporations or limited liability corporations by which to securitize private credit student loans, and to establish Delaware business trusts to which the loans would be sold, and which would issue and sell notes.

70.     The transfer of the loans to the securitization trusts was accomplished by a blanket endorsement of the promissory notes to a special purpose entity. Once sufficient funds were raised from the sale of the notes issued by a trust, the funds would be paid to the special purpose entity, and the special purpose entity would execute a blanket endorsement of the promissory notes to the trust.

71.     The trusts do not take physical possession of the promissory notes. The promissory notes remain in the possession and custody of NSI.

72.     One trust created in connection with the securitization program is the 2003-B Trust. Through the series of transactions described above, Plaintiff's Private Credit Student Loan was transferred from the SLMA to the 2003-B Trust.

**D.      Private Credit Student Loans Made Under the LPA Are Subject to and Not Exempt From California's Usury Law**

73.     California law limits the amount of interest that may be charged on loans such as the Private Credit Student Loans to a rate of 10% per annum.  See Cal. Const., art. XV, § 1(1) (Permitting the charging of interest based upon a written contract "[f]or any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum").

74.     Loans that are "made by ... any bank created and operating under and pursuant to any laws of [California] or of the United States of America" are not subject to the usury limit. See Cal. Const., art. XV, § 1; Calif. Financial Code § 1675.

75.     Students who obtained loans made under the LPA were provided an application form and promissory note. The promissory notes were standard form contracts of adhesion offered on a "take it or leave it" basis, and borrowers could

12

1    not negotiate the terms of the notes.  Each promissory note for a Private Credit

2    Student Loan has the same material provisions.[4]

3         76.    The loan applications identified First National Bank in Sioux Falls,

4    South Dakota as the "Lender," and the promissory note stated that the loan was

5    subject to the laws of the state where the lender was located.

6         77.    California law recognizes that the substance of a transaction, not its

7    form, determines whether a loan is subject to California's usury laws.

8         78.    Notwithstanding the form of the transaction, which indicated Sioux

9    Falls National Bank was the lender, the substance was that SFNB was not the

10   lender.  As evidenced by the LPA and its purpose, the SLMA, and later SLM ECFC

11   and other SLM Corp. subsidiaries, were the actual lenders that made the loans. The

12   SLMA, and later SLM ECFC and other SLM Corp. subsidiaries, bore the risk of

13   loss, not SFNB. The SLMA, and later SLM ECFC and other SLM Corp.

14   subsidiaries, provided the funds for the loans, obtained a participation interest in

15   the loans when the funds were disbursed, acquired the loans at cost, and controlled

16   _every_ material aspect of the lending process. The purpose of the LPA, and the

17   substance of the transactions with borrowers, was to circumvent California State law

18   including California's usury laws.

19        79.    Plaintiff's loan is subject to the California usury limit of 10% per annum

20   because under California law, the substance of the transaction was that the SLMA

21   was the actual lender that made Plaintiff's loan, not SFNB.

22        80.    The SLMA and its successor under the LPA used the LPA to originate

23   and make loans for its own benefit and the benefit of its parent, while making it

24   appear as if the loans were made by Sioux Falls National Bank, thereby seeking to

25

26

27   _____

28   [4]  Plaintiff's Application and Promissory Note are attached as Exhibit A.

1  evade compliance with the State laws applicable to the SLMA and its successors as

2  non-bank lenders.

3  **E.     The Loans Are Not Subject to the National Bank Act Preemption**

4       81.     The National Bank Act ("NBA"), 12 U.S.C. § 85 allows national banks

5  to charge interest at the rate allowed by the laws of their home state and preempts

6  other states' usury laws.

7       82.     The Private Credit Student Loans of Plaintiff and Class members were

8  not made by SFNB, or any other national bank, and instead were made by the

9  SLMA and later SLM ECFC and other SLM Corp. subsidiaries, which were the <u>de</u>

10 <u>facto</u> lender.

11      83.     The SLMA and its successor under the LPA, and its parent and

12 subsidiaries, controlled every aspect of the lending process, not SFNB. The SLMA

13 provided the funds for the loans, obtained a participation interest in the loans when

14 the funds were disbursed, and acquired the loans at cost.

15 **F.     The Department of the Treasury Determined the SLMA Originated**

16      **Student Loans**

17      84.     The Office of Sallie Mae Oversight ("OSMO") of the U.S. Department

18 of the Treasury issued a draft report dated March 2006 entitled, "Lessons Learned

19 from the Privatization of Sallie Mae," which was first published on its website in

20 2011.

21      85.     The draft report stated:

22      Based on its examination of SLMA's relationship with its funding

23      bank partners, OSMO concluded that SLMA, in substance, was

24      originating certain private loans.  The funding banks did not take

25      long-term possession of the notes signed by the student borrowers,

26      nor did they assume the credit risk associated with the notes.  The

27      GSE [SLMA] unconditionally purchased the notes, generally within

28      a month, even in case of the borrower's death.  Further, the

14

1    economic substance of the payments by SLMA to the funding banks

2    reflected loan origination via a "storefront" rather than second

3    market activity.

4    Excerpts of OSMO 2006 Draft Report, at p.142 (footnote omitted).

5       86.    The OSMO Report further explained, "[i]n a true secondary market, a

6    bank would sell its asset into the secondary market (i.e., to Sallie Mae) at its fair

7    value. However, in practice that was not how these loans 'sold' to Sallie Mae were

8    priced." *Id.* at 142 n. 199. Instead, "[t]he loans were sold to Sallie Mae by its

9    'storefront banks' at cost plus interest during the holding period rather than at fair

10   value. This was, in effect, origination by SLMA." *Id.*

11      **G.    NSI Charges and Receives Usurious Interest**

12      87.    The Private Credit Student Loans of Plaintiff and the Class accrue

13   interest from the date of disbursement until paid in full. Interest is charged at a

14   "Variable Rate" under the terms of the promissory note.

15      88.    The Variable Rate is defined as:

16   the annual rate equal to the sum of the highest Prime Rate published in The

17   Wall Street Journal Credit Markets' section, "Money Rates" table on the

18   fifteenth day of the last month of the quarter prior to [the] loan's

19   disbursement or Change Date (the "Current Index") plus or minus the

20   percentage as identified on my Disclosure Statement, which is hereby

21   incorporated into this Note, per annum (the "Margin") and rounded to the

22   nearest one-eighth (0.125) of one percent. (For example, the Variable Rate

23   for each quarter beginning January 1st will be determined by the applicable

24   Prime Rate published on the preceding December 15th.) The Margin is

25   based on my sSchool, credit history and co-borrower-s credit history. Once

26   set, the Margin does not change. The actual interest rate during the quarter

27   in which my loan is disbursed will be on my Disclosure Statement.

28   Ex. C, Sec. C.2.

15

89.     Thus, in any given quarter, NSI charges interest on Private Credit Student Loans at a variable rate equal to the (variable) Prime Rate plus the (fixed) Margin, identified in a disclosure statement provided to the borrower.

90.     During the Class Period defined below, the Prime Rate fluctuated between 3.25% and 9.5%. See historical data for the Prime Rate, available at http://www.federalreserve.gov/releases/h15/data.htm.  The Prime Rate published in the Wall Street Journal also ranged between 3.25% and 9.5% during the Class Period.

91.     The fixed margin set for Plaintiff's loan was 2%. Ex. C, p. 2.

92.     From July 1, 2006 to September 30, 2007, NSI charged Plaintiff interest at 10.25% per annum.

93.     Because the substance of the transaction was that the SLMA was the actual lender and made Plaintiff's loan, and the actual lender was not SFNB, the loan was and is subject to the California usury limit of 10% per annum, and the interest NSI charged Plaintiff at a rate exceeding 10% per annum was usurious.

94.     On information and belief, NSI charged numerous student borrowers who have Private Credit Loans interest at a rate exceeding 10% per annum.

95.     On information and belief, NSI received millions of dollars of interest on Private Credit Student Loans throughout the Class Period that was charged at a rate exceeding 10% per annum and was usurious under California law.

**H.    NSI Benefits From the Usurious Interest**

96.     NSI charges each of the Trusts and other entities that own the Private Credit Student Loans, including the 2003-B Trust, a monthly servicing fee. The monthly servicing fee is 1/12 (not to exceed 0.007%) of the outstanding principal of the loans being serviced.

97.     NSI benefits from the usurious interest charged and paid by Plaintiff and members of the Class because the principal of the loans it services has been unlawfully increased by usurious charges. If interest were limited to 10% per annum,

more of a borrower's payment would have been applied to principal, thus reducing NSI's servicing fee.

### I.   The 2003-B Trust Receives Usurious Interest

98.   NSI transfers payments it receives from borrowers to the trust or other entity that has been assigned the loan, including the 2003-B Trust to which Plaintiff's loan was assigned.

99.   The 2003-B Trust received Plaintiff's payments of interest that had been charged at a rate exceeding 10% per annum.

100.   On information and belief, the 2003-B Trust received and continues to receive payments from borrowers of interest charged at a rate exceeding 10% per annum.

## V.   REPRESENTATIVE PLAINTIFF AND THE CLASS

### A.   Plaintiff Marlene Blyden

101.     On July 3, 2002, Plaintiff Marlene Blyden applied for a Private Credit Student Loan, specifically a Signature Student Loan, in California in the amount of $20,000.00, to pay for the costs of her education at DeVry University. Ex. A.

102.   Upon information and belief, Plaintiff Blyden's loan was assigned to the SLMA shortly after disbursement.

103.   Thereafter, the SLMA either directly or through intermediaries transferred the loan to the 2003-B Trust.

104.   NSI has serviced Plaintiff's Private Credit Student Loan since inception.

### B.   Plaintiff's Private Credit Student Loan

105.   Like all other borrowers who were provided Private Credit Student Loans as to which Sioux Falls National Bank was identified as the lender, Plaintiff Blyden received a standard form promissory note.  Ex. A.  This promissory note could not be modified or otherwise negotiated by Plaintiff or other borrowers since

1    it was offered solely on a "take it or leave it" basis, and included statements such as

2    "THIS IS A NON-NEGOTIABLE CONSUMER NOTE." Ex. A, p. 4.

3    106.   Plaintiff's promissory note, like the promissory notes for all other

4    Private Credit Student Loans as to which Sioux Falls National Bank was identified

5    as the lender, included a one-sided assignment clause providing "If this Note is

6    assigned, the Assignee will become the owner of this Note and will have all your

7    rights to enforce this Note against me [the borrower]" and "I may not assign this

8    Note or any of its benefits or obligations.  You may assign this Note at any time."

9    See Ex. A at Sec. L.2 and Sec. L.10.

10   107.   Plaintiff's promissory note, like the promissory notes for all other

11   Private Credit Student Loans as to which Sioux Falls National Bank was identified

12   as the lender, includes a promise to pay providing that "I will make consecutive

13   monthly payments during the Repayment Period in the amounts and on or before

14   the payment due dates shown on my statements until I have paid all of the principal

15   and interest and any other charges I may owe on this Note." Ex. A, Sec. D.2.

16   108.   Plaintiff's promissory note, like all other promissory notes for Private

17   Credit Student Loans as to which Sioux Falls National Bank was identified as the

18   lender, provided that the interest would be determined at a variable rate by the

19   method stated above in paragraph 88. Ex. A, Sec. C.2.

20   109.   Plaintiff's promissory note, like the promissory notes for all other

21   Private Credit Student Loans as to which Sioux Falls National Bank was identified

22   as the lender, provided that the interest rate would be determined on a quarterly

23   basis. Ex. A, Sec. C.2.

24   110.   Plaintiff's promissory note, like the promissory notes for all other

25   Private Credit Student Loans as to which Sioux Falls National Bank was identified

26   as the lender, provided that accrued interest that was not paid would be capitalized,

27   *i.e.*, added to the loan principal, and interest would then be charged on the

28   increased principal. Ex. A, Sec. A, Sec. D.

111.    Plaintiff's promissory note, like the promissory notes for all other Private Credit Student Loans as to which Sioux Falls National Bank was identified as the lender, provided for the collection of Supplemental Fees, specifically including a disbursement fee based upon a "percentage of the principal balance of my loan" which could either be "deduct[ed] from the disbursement or add[ed] to the principal loan balance" of the loan, and a repayment fee that would be "a percentage of the principal balance of my loan after unpaid interest accrued during the Interim Period is capitalized."  See Ex. A, Sec. F.1,2.

112.    As with other borrowers who were provided Private Credit Student Loans identifying Sioux Falls National Bank as the lender, Plaintiff received a standard Disclosure form advising her of her margin and the supplemental fee. Ex. C. The Disclosure form sent to Plaintiff was dated September 17, 2002, and informed her that her margin was 2% plus a $1,200 supplemental fee, making the total loan amount $21,200.00. Ex. C, p. 2.

113.    On June 29, 2006, the Prime Rate rose to 8.25% where it remained for nearly 15 months, until September 18, 2007, when it was lowered to 7.75%.

114.    The annual interest rate charged on Plaintiff's Private Credit Student Loan for the quarterly periods beginning July 1, 2006 and continuing to September 30, 2007, was 10.25%.

115.    Plaintiff paid interest that had been charged at a rate of more than 10% per annum on at least seven separate occasions.

116.    On at least one occasion during that same period Plaintiff did not pay interest that had been charged at a rate exceeding 10% per annum, and such interest was capitalized (added to the principal).

117.    Thereafter, NSI charged Plaintiff interest on the interest that had been capitalized.

118.    Plaintiff, like all Class members who were provided Private Credit Student Loans as to which Sioux Falls National Bank was identified as the lender,

19

did not know, nor did they have reason to know, that the loan was subject to California law.

119.   Neither the SLMA, NSI, nor Sioux Falls National Bank disclosed to Plaintiff, other members of the Class, or the public, that under the LPA the substance of the transaction was that the Private Credit Student Loans had been made by the SLMA and its successors and that, therefore, the interest rates and fees on the loans were subject to California law.

120.   Plaintiff, like all Class members, did not know and had no reason to suspect the interest rate charged by NSI exceeded the maximum rate allowed by law.

121.   Plaintiff and other Class members' promissory notes and related documents were replete with disclosures and other provisions touted as being required by law. Accordingly, Plaintiff and other Class members had no reason to believe that the SLMA or its successors or NSI, would fail to comply with applicable law regarding the interest rate, and they reasonably trusted and relied on them to charge interest in accordance with the law.  Unbeknownst to Plaintiff and Class members, Defendants violated applicable California law by assessing interest at a rate exceeding 10% per annum.

122.   Plaintiff and Class members did not consent to pay interest that was charged at a usurious rate, nor could they have consented because at the time they made the payments they did not know the rate was usurious.

**C.    Plaintiff's and the Class Member's Claims Are Not Time Barred**

123.   Plaintiff and Class members did not know and had no reason to suspect that the substance of the transaction was that the SLMA and its successors under the LPA were the actual lenders.

124.   On November 28 2013, the LPA between the SLMA and Sioux Falls Bank became publicly available when it was filed as an exhibit following NSI's

1  failure to justify why it should remain sealed and confidential. See Dkt. No. 170-6,

2  *Ubaldi, et al., v. SLM Corp., et al.*, No. 2:11-cv-1320-ELP (N.D. Cal.).

3      125.   Prior to the public disclosure of the LPA, Plaintiff and Class members

4  did not know and could not have discovered that SFNB did not have a risk of loss

5  on the loans; that the SLMA provided the funds for the loans; that the SLMA

6  obtained a participation interest in their loans when the funds were disbursed; that

7  the loans were sold or assigned to the SLMA at cost; that all materials aspects of the

8  loan process were controlled by the SLMA; or that the lender identified on their

9  promissory notes was a mere nominee used by the SLMA for the purpose of

10  circumventing state law.

11      126.   Plaintiff and Class members did not know, had no reason to suspect

12  and could not have discovered the facts establishing their claims until the LPA

13  became publicly available because their claims turn on the loans having been made

14  by the SLMA and its successors under the LPA.  Therefore, the limitations period

15  did not commence until November 28, 2013, and extends back to January 1, 2002,

16  the beginning date of the LPA.

17      127.   The SLMA and NSI fraudulently concealed the facts giving rise to the

18  claims of Plaintiff and Class members by affirmatively misrepresenting in their loan

19  applications that the lender was Sioux Falls National Bank, and thereby prevented

20  Plaintiff and the Class members from filing suit.

21      128.   As a consequence of the fraudulent concealment by the SLMA and its

22  successor entities, and by NSI, the limitations period did not commence until

23  Plaintiff discovered the facts that establish the existence of her claims.

24

25

26

27

28

# VI.   CLASS ACTION ALLEGATIONS

129.   This action asserts claims pursuant to Federal Rules of Civil Procedure 23(a), and 23(b).

130.   Plaintiff Blyden brings claims on behalf of herself and a Class defined as:

> All persons who obtained a Private Credit Student Loan with a loan application that identified Sioux Falls National Bank as the lender and listed California as the residence of the borrower, and who on or after January 1, 2002, were charged interest at an annual rate of more than 10% for any quarterly period.

131.   The Class is subject to the following exclusions:

a.   Officers, directors, managerial employees of NSI and its parent and the parent's subsidiaries and their immediate families, and any of the judges of the court before which this case is pending and their immediate families; and

b.   All Private Credit Student Loans made with a promissory note that includes an arbitration clause or class action waiver.

## A.   The Class

132.   Upon information and belief, there are tens of thousands of members in the Class who are geographically dispersed throughout California. Therefore, individual joinder of all members of the Class would be impracticable.

133.   Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members.  For the Class, these common legal or factual questions include:

a.   Whether under California law, the substance of the transaction was that the actual lender who made the loans under the LPA was the SLMA and its successors under the LPA;

b.   Whether the loans are subject to the California usury limit of 10% per annum;

22

1        c.   Whether NSI charged interest on Private Credit Student Loans at rates
2   exceeding 10 percent per annum;

3        d.   Whether under the National Bank Act, the actual lender who made the
4   loans under the LPA was the SLMA and its successors under the LPA;

5        e.   Whether the interest preemption provision of the National Bank Act is
6   inapplicable to the loans;

7        f.   Whether NSI's conduct violated California's Unfair Competition Law,
8   California Business and Professions Code §§ 17200, *et seq.*;

9        g.   Whether the 2003-B Trust's conduct violated California's Unfair
10  Competition Law, California Business and Professions Code §§ 17200, *et seq.*;

11       h.   Whether NSI is liable for violations of California's Usury Law;

12       i.   Whether the 2003-B Trust is liable for violations of  California's usury
13  laws;

14       j.   Whether NSI is liable for conversion;

15       k.   Whether the 2003-B trust is liable for conversion;

16       l.   The appropriate measure of damages; and

17       m.   The appropriate scope of injunctive relief.

18       134.   Plaintiff Blyden's claims are typical of the claims of the Class, in that
19  Plaintiff Blyden was charged and paid interest that had been charged at a rate
20  exceeding 10% per annum on her Private Credit Student Loan, and her loan was
21  made in California. Plaintiff Blyden, therefore, is not materially different in any
22  relevant respect from any other Class member, and the relief sought is common to
23  the Class.

24       135.   Plaintiff Blyden is an adequate representative of the Class because her
25  interests do not conflict with the interests of the Class members, and she has
26  retained competent counsel who are experienced in conducting complex lending
27  and class action litigation. Plaintiff Blyden and her counsel will adequately protect
28  the interests of the Class.

136.   A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member likely will be small by comparison to the burden and expense of the complex litigation necessitated by Defendants' wrongful conduct.  Thus, it would be virtually impossible for Class members to obtain redress on an individual basis. Additionally, class-wide litigation is preferable because individualized actions could lead to inconsistent or contradictory judgments.

137.   A class action also presents far fewer management difficulties, and provides the benefits of single adjudication, including economies of scale, and comprehensive supervision by a single court.  In the alternative, the Class may be certified because Defendants have acted or refused to act on grounds generally applicable to the members of the Class, thereby making appropriate preliminary and final equitable relief with respect to the Class.

138.   Upon information and belief, all records concerning each of the Private Credit Student Loans entered into by members of the Class are in the possession or control of NSI and available through discovery.

## VII.   CLAIMS FOR RELIEF

A.   <u>First Claim For Relief</u> — "Unlawful" Business Practices in Violation of The Unfair Competition Law, Bus. & Prof. Code §§ 17200, *Et Seq*. For Plaintiff Blyden and the Class

139.    Plaintiff incorporates paragraphs 1-138 as if fully stated here.

140.   This claim is brought on behalf of Plaintiff Blyden and the Class against all Defendants.

141.   The Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq*., defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice.

142.   A business act or practice is "unlawful" if it violates any established state or federal law.

143.   Article XV of the California Constitution sets a maximum legal rate of 10% per annum for interest charged on loans for educational expenses such as the Private Credit Student Loans. In pertinent part, it states:

> Section 1.  The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest:
>
> (1) For any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum....

144.   The Private Credit Student Loans are loans of money primarily for personal, family, or household purposes subject to Cal. Const., art. XV, § 1(1).

145.   The Private Credit Student Loans are loans of money expressed "in writing" within the meaning of the Usury Law.  Cal. Civ. Code § 1916-1.

146.   The 10% interest rate limit set forth in Cal. Const., art. XV, § 1(1) and the Usury Law apply to the Private Credit Student Loans, and such loans are not subject to any of the exemptions from the Usury Law.

147.   The loans were not made by a national bank within the meaning of the National Bank Act, 12 U.S.C. §§ 85 and 86.

148.   NSI, and the 2003-B Trust and its representative, The Bank of New York Mellon Trust Company, N.A., have charged interest on the Private Credit Student Loans at a rate exceeding 10 % per annum for quarterly periods and thus exceeding the legal limit.

149.   The interest charged at a usurious rate that was not paid was capitalized (added to the outstanding principal).

150.   Defendants have violated and continue to violate, the "unlawful" prong of the UCL by charging borrowers interest in violation of California's Constitution, art. XV, § 1(1), and the Usury Law. By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

151.   Through their unlawful acts and practices Defendants have obtained, and continue to unfairly obtain, money from Plaintiff Blyden and members of the Class. As such, Plaintiff Blyden requests on behalf of herself the Class the relief set forth in the Prayer, including that this Court enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein. Otherwise, the Class may be irreparably harmed and/or denied an effective and complete remedy.

**B.** <u>Second Claim For Relief</u> – **"Unfair" Business Practice in Violation of The Unfair Competition Law, Bus. & Prof. Code §§ 17200, *Et Seq.* For Plaintiff Blyden and the Class**

152.   Plaintiff incorporates paragraphs 1-138 as if fully stated here.

153.   This claim is brought on behalf of Plaintiff Blyden and the Class against all Defendants.

154.   A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

155.   NSI and the 2003-B Trust and its representative, The Bank of New York Mellon Trust Company, N.A., have and continue to violate the "unfair" prong of the UCL through their assessment of interest at a rate exceeding 10% per annum on the Private Credit Student Loans.

156.   The Defendants' assessment of the interest at rates exceeding 10% per annum violates the "unfair" prong of the UCL because Defendants are not entitled to charge such interest, and such interest is excessive and not justified by any business need, and creates an onerous burden on Plaintiff and Class members.

157.   The gravity of the harm to Plaintiff and Class members resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives for Defendants' conduct. By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unfair business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

158.   Through unfair acts and practices Defendants have obtained, and continue to obtain, money from Plaintiff Blyden and members of the Class. As such, Plaintiff Blyden requests on behalf of herself and all Class members the relief set forth in the Prayer, including that this Court enjoin Defendants from continuing to violate the Unfair Competition Law as set forth herein.  Otherwise, the Class may be irreparably harmed and/or denied an effective and complete remedy.

C.   <u>Third Claim For Relief</u> — Usury in Violation of Article XV, Section 1, of the California Constitution For Plaintiff Blyden and the Class

159.   Plaintiff incorporates paragraphs 1-138 as if fully stated here.

160.   This claim is brought on behalf of Plaintiff Blyden and the Class against all Defendants.

161.   Under the California Constitution, the maximum rate of interest for any loan, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, is 10 % per annum.  Cal. Const., art. XV, § 1(1).

162.   The Private Credit Student Loans are "loans" for "money" for use "primarily for personal, family, or household purposes," within the meaning of the California Constitution, art. XV, § 1(1).

163.   The Private Credit Student Loans are subject to the California Usury Law and are not excluded or otherwise exempt from the constitutional provisions on usury.

164.   NSI and the 2003-B Trust and its representative, The Bank of New York Mellon Trust Company N.A., charged Plaintiff Blyden and all members of the Class interest exceeding the statutory maximum rate of 10% per annum.

165.   The Private Credit Student Loans and interest thereon are absolutely repayable.

166.   Through usurious charges, Defendants have received, and continue to receive, money from Plaintiff Blyden and Class members in violation of California's Constitution. As such, Plaintiff Blyden requests on behalf of herself and the Class the relief set forth in the Prayer, including that this Court enter an order applying all interest that has been at a usurious rate to principal and limiting any future interest to not more than 10% per annum. Plaintiff Blyden also requests that this Court award any other relief that is just and proper.

D.   **Fourth Claim For Relief** — Violation of the Usury Law For Plaintiff Blyden and the Class

167.   Plaintiff incorporates paragraphs 1-138 as if fully stated here.

168.   This claim is brought on behalf of Plaintiff Blyden and the Class against all Defendants.

169.   California's statutory proscription against usury is set forth in the Usury Law, an un-codified Initiative Measure adopted nearly 100 years ago. See Cal. Civ. Code § 1916-1 through 1916-3.

170.   The Usury Law provides:

The rate of interest upon the loan or forbearance of any money, goods or things in action or on accounts after demand or judgments rendered in any court of this state, shall be seven dollars upon the one hundred dollars for one year and at that rate for a

28

1          greater or less sum or for a longer or a shorter time; but it shall be

2          competent for parties to contract for the payment and receipt of a

3          rate of interest not exceeding twelve dollars on the one hundred

4          dollars for one year and not exceeding that rate for a greater or less

5          sum or for a longer or shorter time, in which case such rate

6          exceeding seven dollars on one hundred dollars shall be clearly

7          expressed in writing.

8      Cal. Civ. Code § 1916-1.

9         171.   As recognized in *Penziner v. West American Finance Co.*, 10 Cal. 2d

10 160, 174, 74 P.2d 252 (Cal. 1937), the 12% interest rate established by the Usury Law

11 for contracts in writing was amended to 10% by adoption of the usury provisions of

12 the California Constitution.

13         172.   Private Credit Student Loans are "loans" for "money" expressed "in

14 writing" within the meaning of the Usury Law.  The loans are not excluded or

15 otherwise exempt from the Usury Law.

16         173.   NSI and the 2003-B Trust and its representative, The Bank of New

17 York Mellon Trust Company N.A., charged Plaintiff Blyden and Class members

18 interest exceeding 10% per annum.

19         174.   Defendants willfully intended to enter these transactions and to collect

20 interest charged at a rate exceeding 10% per annum.

21         175.   Through usurious charges, Defendants have received, and continue to

22 receive, money from Plaintiff Blyden and Class members in violation of the Usury

23 Law, as amended. As such, Plaintiff Blyden requests on behalf of herself and Class

24 members the relief set forth in the Prayer, including an award of three times the

25 interest paid on the Private Credit Student Loans as provided by the Usury Law,

26 and an order canceling all future interest on the Private Credit Student Loans

27 exceeding 10% per annum. Cal. Civ. Code § 1916-3(a).

28

1    **E.**     **Fifth Claim For Relief − Claim For Money Had and Received For**
2              **Plaintiff Blyden and the Class**

3         176.   Plaintiff incorporates paragraphs 1-138 as if fully stated here.

4         177.   This claim is brought on behalf of Plaintiff Blyden and the Class
5    against all Defendants.

6         178.   Defendants NSI and the 2003-B Trust, and its representative, The Bank
7    of New York Mellon Trust Company N.A., are indebted to Plaintiff and Class
8    members.

9         179.   Defendants received money belonging to Plaintiff and Class members
10   that should have been used for their benefit by reducing the outstanding principal
11   on their loans.

12        180.   The money was not used for the benefit of Plaintiff or the Class.

13        181.   The money was instead used by Defendants to pay interest that was
14   charged at a usurious rate.

15        182.   Defendants have not returned any money to Plaintiff or the Class, nor
16   have Defendants applied the money to principal for the benefit of the Plaintiff or
17   the Class.

18        183.   As a matter of equity and good conscience, the money should be
19   returned to Plaintiff and the Class or be used for their benefit by applying it to the
20   payment of the principal of their respective loans.

21   **F.**     **Sixth Claim For Relief - Conversion**

22        184.   Plaintiff incorporates paragraphs 1-138 as if fully stated here.

23        185.   This claim is brought on behalf of Plaintiff Blyden and the Class
24   against all Defendants.

25        186.   Defendants wrongfully took payments of interest that had been charged
26   at a rate exceeding 10% per annum from Plaintiff Blyden and Class members.

27        187.   Plaintiff Blyden and Class members were the proper owners of the
28   interest payments wrongfully taken by Defendants at the time of the taking.

30

1   188.   Plaintiff Blyden and Class members were damaged as a result of the

2   wrongful taking of the interest charged at a rate exceeding 10% per annum. The

3   specific sums in which Plaintiff Blyden and Class members were damaged are

4   capable of identification using Defendants' records.

5

6   **VIII.  PRAYER**

7   WHEREFORE, Plaintiff, on behalf of herself and all Class members, requests

8   an award and relief as follows:

9   **A.**   An order certifying that this action is properly brought and may be

10  maintained as a class action, that Plaintiff Blyden be appointed a Class

11  Representative for the Class, and that Plaintiff's counsel be appointed Class

12  Counsel.

13  **B.**   Restitution in an amount to be determined.

14  **C.**   An order applying to principal all interest paid that was charged at a

15  usurious rate.

16  **D.**   An order awarding three times the interest paid by Plaintiff Blyden and

17  Class members that was charged at a usurious rate or, alternatively, three times the

18  amount of interest paid on Private Credit Student Loans exceeding the 10% per

19  annum legal limit.

20  **E.**   Damages as permitted under California law.

21  **F.**   An order enjoining interest being charged at a rate exceeding 10% per

22  annum Plaintiff's and Class members' Private Credit Student Loans.

23  **G.**   An order awarding Plaintiffs their costs of suit, including reasonable

24  attorneys' fees and pre- and post-judgment interest.

25  **H.**   Such other and further relief as may be deemed necessary or

26  appropriate.

27

28

31

## IX.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims and/or issues so triable.

DATED:  August 4, 2015          By:  */s/ William J. Genego*